COASTAL OIL & GAS CORP. and
Coastal Oil & Gas USA, L.P.,
Petitioners,

v.

GARZA ENERGY TRUST
et al., Respondents.

No. 05–0466.

Supreme Court of Texas.

Aug. 29, 2008.

Rehearing Denied Nov. 14, 2008.

Elizabeth N. Miller, Jane M.N. Webre, Scott Douglass & McConnico, L.L.P., Austin, TX, for Petitioners.

Ramon Garcia, Law Offices of Ramon Garcia, P.C., Edinburg, TX, Michael D. Jones, Clarence E. Reed, Kilburn Jones & Gill, LLP, Houston, TX, George L. Willingham, Law Offices of George L. Willingham, Bennett Stahl, Curl & Stahl, P.C., Roy R. Barrera III, Golden & Barrera, L.L.P., San Antonio, TX, for Respondents.

Jerry Patterson, Texas General Land Office, Rex H. White, Jr., Law Offices of Rex H. White, Jr., John Robert Hayes, Hayes & Owens, Lindil Carol Fowler, Austin, TX, Everard A. Marseglia Jr., Liskow & Lewis, Houston, TX, Raymond B. Roush, Chesapeake Energy Corp., Oklahoma City, OK, David M. Hundley, Dallas, TX, W. Wendell Hall, Fulbright & Jaworski L.L.P., San Antonio, TX, for Amici.

Justice HECHT delivered the opinion of the Court, in which Justice BRISTER, Justice Green, Judge CHRISTOPHER,[1] and Justice PEMBERTON[2] joined, and in all but Part II–B of which Justice JEFFERSON, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined.

The primary issue in this appeal is whether subsurface hydraulic fracturing of a natural gas well that extends into another's property is a trespass for which the value of gas drained as a result may be recovered as damages. We hold that the rule of capture bars recovery of such damages. We also hold:

- mineral lessors with a reversionary interest have standing to bring an action for subsurface trespass causing actual injury;

- the measure of damages for breach of the implied covenant to protect against drainage is the value of the minerals lost because of the lessee's failure to act with reasonable prudence, and there is no evidence of that value in this case;

- some evidence supported the jury's finding of breach of the implied covenant to develop, and whether lessors' repudiation of the lease was a defense was, on this record, a matter of law;

- some evidence supported the jury's finding of bad faith pooling;

---

1. Hon. Tracy E. Christopher, Judge, 295th District Court, Harris County, Texas, sitting for JUSTICE O'NEILL by commission of Hon. Rick Perry, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

2. Hon. Robert H. Pemberton, Justice, Court of Appeals for the Third District of Texas at Austin, sitting for JUSTICE WAINWRIGHT by commission of Hon. Rick Perry, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

- admission into evidence of a memorandum containing a racial slur was reversible error; and

- the trial court did not abuse its discretion in refusing to abate this case for two related cases.

We reverse the judgment of the court of appeals[3] and remand the case to the trial court for further proceedings.

## I

Respondents,[4] to whom we shall refer collectively as Salinas, own the minerals in a 748–acre tract of land in Hidalgo County called Share 13, which they and their ancestors have occupied for over a century. At all times material to this case, petitioner Coastal Oil & Gas Corp.[5] has been the lessee of the minerals in Share 13 and an adjacent tract, Share 15. Coastal was also the lessee of the minerals in Share 12 until it acquired the mineral estate in that 163–acre tract in 1995. A natural gas reservoir, the Vicksburg T formation, lies between 11,688 and 12,610 feet below these tracts. The following schematic depicts the surface area.

Title disputes have roiled the area for years. Coastal interpleaded respondents

**3.** *Mission Resources, Inc. v. Garza Energy Trust*, 166 S.W.3d 301 (Tex.App.–Corpus Christi 2005).

**4.** Respondents are Hilda Salinas, Hilaria Salinas, Margarito Salinas, Maria Rosa Salinas, Vincente Saenz, Jr., Mercedes Salinas de Longoria, Miguel Angel Salinas, Maria Elva Delgado, Edwardo Saenz, Jr., Olivia Salinas Perez, Lydia Robbins, Aurelia Salinas Sendejo, Maria Matilde Salinas Guerrero, Luis Humberto Delgado, Marco Antonio Delgado, Ramon Garcia, Jesus Israel Muniz, Javier Lopez, Francisca Muniz Vasquez, Meliton Lopez, San Juanita Lopez Alaniz, Olga Betancourt Lopez, Myrna Betancourt Lopez, Sylvia Nora Betancourt Lopez, Norberto Lopez, Oscar Angel Lopez, Leticia Lopez, Ampora S. de Garza, Nellie S. Ibarra, Norma L. Torres, Esteban Saenz, Mary Elizabeth Saenz, Eloy Saenz, Hilaria Muniz Hernandez, and the beneficiaries of the Garza Energy Trust, dissolved December 31, 2004—Juan Lino Garza, Sr., Romulo Garza, Guadalupe Garza, Jr., Aida Garza Lopez, Maria Rita Garza Carreles, Elma Garza Cantu, Eduardo Garza, Jose Carmen Garza, Jr., Carlos Garza, and Billy Salvador Robbins.

**5.** Coastal is now El Paso Production Oil & Gas Company. Coastal Oil & Gas USA, L.P. is also a petitioner, but the parties have identified no difference in the interests of the two Coastal entities, and we refer to them collectively as "Coastal".

in a 1978 action to resolve disagreements among them over their respective interests in Share 13. Those issues were resolved by an agreed judgment in 1982. Many Share 13 owners sued in 1988[6] and again in 1995[7] over their boundary with Share 15. That issue was not resolved until 1999.[8] The plaintiffs in those cases also claimed that their gas was being drained to wells on Share 15.

From 1978 to 1983, Coastal drilled three wells on Share 13, two of which were productive, the M. Salinas No. 1 and No. 2V, though the other, the B. Salinas No. 1 ("BS1" on the diagram), was not. In 1994, Coastal drilled the M. Salinas No. 3, and it was an exceptional producer. The No. 3 well was about 1,700 feet from Share 12. The closest well on Share 12 was the Pennzoil Fee No. 1 ("P1" on the diagram), but Coastal wanted one closer, so in 1996, Coastal drilled the Coastal Fee No. 1 in the northeast corner of Share 12, as close to Share 13 (and the M. Salinas No. 3) as Texas Railroad Commission's statewide spacing Rule 37 permitted—467 feet from the boundaries to the north and east.[9] That location was too close to the Pennzoil Fee No. 1,[10] and the Commission refused Coastal an exception because both wells would drain from Share 13. So Coastal shut in the Pennzoil Fee No. 1, a produc-

ing well, in order that it could operate the Coastal Fee No. 1 well near Share 13. In February 1997, Coastal drilled the Coastal Fee No. 2, also near Share 13.

In March, Salinas sued Coastal for breach of its implied covenants to develop Share 13 and prevent drainage. Salinas was concerned that Coastal was allowing Share 13 gas, on which Coastal owed Salinas a royalty, to drain to Share 12, where Coastal, as both owner and operator, was entitled to the gas unburdened by a royalty obligation. Salinas's suit prompted a flurry of drilling by Coastal on Share 13— eight wells in fourteen months. Not until late 1999 did Coastal drill again on Share 12.

The Vicksburg T is a "tight" sandstone formation, relatively imporous and impermeable, from which natural gas cannot be commercially produced without hydraulic fracturing stimulation, or "fracing", as the process is known in the industry. This is done by pumping fluid down a well at high pressure so that it is forced out into the formation. The pressure creates cracks in the rock that propagate along the azimuth of natural fault lines in an elongated elliptical pattern in opposite directions from the well. Behind the fluid comes a slurry containing small granules called proppants—sand, ceramic beads, or baux-

6. *Juan Lino Garza, et al. v. Elizabeth H. Coates Maddux, et al.*, Cause No. C–035–88–G (370th Dist. Ct., Hidalgo County, Tex., filed Jan. 7, 1988).

7. *Amelia Garza de Salinas, et al. v. Elizabeth H. Coates Maddux, et al.*, Cause No. C–6239–95–B (93rd Dist. Ct., Hidalgo County, Tex., filed Dec. 7, 1995).

8. *Garza v. Maddux*, 988 S.W.2d 280 (Tex. App.–Corpus Christi 1999, pet. denied) (affirming summary judgment in the *Juan Lino Garza* suit).

9. 16 Tex. Admin. Code § 3.37(a)(1) (2007) (Tex. R.R. Comm'n, Statewide Spacing Rule) ("No well for oil, gas, or geothermal resource shall

hereafter be drilled nearer than 1,200 feet to any well completed in or drilling to the same horizon on the same tract or farm, and no well shall be drilled nearer than 467 feet to any property line, lease line, or subdivision line; provided the commission, in order to prevent waste or to prevent the confiscation of property, may grant exceptions to permit drilling within shorter distances than prescribed in this paragraph when the commission shall determine that such exceptions are necessary either to prevent waste or to prevent the confiscation of property.").

10. *Id.*

ite are used—that lodge themselves in the cracks, propping them open against the enormous subsurface pressure that would force them shut as soon as the fluid was gone. The fluid is then drained, leaving the cracks open for gas or oil to flow to the wellbore. Fracing in effect increases the well's exposure to the formation, allowing greater production. First used commercially in 1949, fracing is now essential to economic production of oil and gas and commonly used throughout Texas, the United States, and the world.

Engineers design a fracing operation for a particular well, selecting the injection pressure, volumes of material injected, and type of proppant to achieve a desired result based on data regarding the porosity, permeability, and modulus (elasticity) of the rock, and the pressure and other aspects of the reservoir. The design projects the length of the fractures from the well measured three ways: the hydraulic length, which is the distance the fracing fluid will travel, sometimes as far as 3,000 feet from the well; the propped length, which is the slightly shorter distance the proppant will reach; and the effective length, the still shorter distance within which the fracing operation will actually improve production. Estimates of these distances are dependent on available data and are at best imprecise. Clues about the direction in which fractures are likely to run horizontally from the well may be derived from seismic and other data, but virtually nothing can be done to control that direction; the fractures will follow Mother Nature's fault lines in the formation. The vertical dimension of the fracing pattern is confined by barriers—in this case, shale—or other lithological changes above and below the reservoir.

For the Coastal Fee No. 1, the fracing hydraulic length was designed to reach over 1,000 feet from the well. Salinas's expert, Dr. Michael J. Economides, testified he would have designed the operation to extend at least 1,100 to 1,500 feet from the well. The farthest distance from the well to the Share 13 lease line was 660 feet.[11] The parties agree that the hydraulic and propped lengths exceeded this distance, but they disagree whether the effective length did. The lengths cannot be measured directly, and each side bases its assertion on the opinions of an eminent engineer long experienced in hydraulic fracturing: Economides for Salinas, and Dr. Stephen Allen Holditch for Coastal. Holditch believed that a shorter effective length was supported by post-fracing production data.

All the wells on Share 12 and Share 13 were fraced. As measured by the amount of proppant injected into the well, the fracing of the Coastal Fee No. 1 and No. 2 wells was, as Economides testified, "massive", much larger than any fracing operation on a well on Share 13. Several months after filing suit, Salinas amended his pleadings to assert a claim for trespass, alleging that Coastal's fracing of the Coastal Fee No. 1 well invaded the reservoir beneath Share 12, causing substantial drainage of gas.

In 1997, Coastal formed an 80–acre unit comprised of just under 73 acres in the southwest corner of Share 13 and a little over seven acres in the southeast corner of Share 12. The unit included the M. Salinas No. 2V and No. 4 wells but did not include a well on Share 12. The unit benefited Salinas by making it possible for the M. Salinas No. 8 to be drilled in the

---

**11.** The well is on the corner of a square, the opposite sides of which are the lease lines. The shortest distance between the well and Share 13 is 467 feet. The longest distance is the length of the diagonal, 660 feet.

most desirable location, within 1,200 feet of the M. Salinas No. 2–V, which Rule 37 would otherwise have prohibited.[12] But Salinas complained that the unit effectively freed Coastal from its royalty obligation on the amount of gas equal to Share 12's portion of the gas produced from the two unit wells on Share 13, about nine percent (%ths), since that amount would be apportioned to Share 12, and that Salinas would have received the same benefit—the No. 8 well—along with higher royalties if Coastal had included only one Share 12 acre in the unit. Salinas added to his lawsuit a claim for bad-faith pooling.

At trial, Salinas claimed that he had lost royalty revenue because of Coastal's delay in developing Share 13. Coastal argued that its delays were due in part to concerns over uncertainties about Salinas's title. In response, Salinas offered in evidence an internal memo from Coastal's files, written in 1977, discussing title problems among the Share 13 owners which the author attributed to the fact that their ancestors were, in his words, "mostly illiterate Mexicans". The memo concluded that drilling on Share 13 was worth the risk despite the title problems. Coastal's objection that the memo was irrelevant and unfairly prejudicial was overruled.[13] Coastal also offered evidence that because the price of gas had been increasing, Salinas actually benefited from any delay in development.

Regarding drainage, Salinas's expert, Economides, testified that because of the fracing operation on the Coastal No. 1 well, 25–35% of the gas it produced drained from Share 13. He explained he could not be more definite because of two factors that could not be ascertained: the exact direction taken by the fractures and the extent of their incursion into Share 13, and whether conditions in the reservoir varied from Share 12 to Share 13. Economides calculated the value of that gas to be between $388,000 and $544,000. Coastal, as noted, offered evidence from its expert that no gas drained from Share 13 due to fracing. On their bad faith pooling claim, Salinas offered evidence of $81,619 damages in lost royalties.

The jury found:

· Coastal failed to reasonably develop Share 13 after 1993, causing Salinas $1.75 million damages for interest on lost royalties;

· Coastal breached its duty to pool in good faith, causing Salinas $1 million damages in lost royalties;

· Coastal's fracing of the Coastal Fee No. 1 well trespassed on Share 13, causing substantial drainage, which a reasonably prudent operator would have prevented, and $1 million damages in lost royalties;

· Coastal acted with malice and appropriated Salinas's property unlawfully, and should be assessed $10 million punitive damages;

· Salinas's reasonable attorney fees for trial were $1.4 million.

The trial court reduced the damages for bad-faith pooling from $1 million to $81,619 and the damages for drainage from $1 million to $543,776, in each instance the maximum amount supported by Salinas's evidence, and otherwise rendered judgment on the verdict.

The court of appeals reversed the attorney fee award because it included fees for Salinas's prosecution of a claim of breach

---

12. *See* Rule 37, *supra* note 9.

13. *See* Tex.R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . .").

of the implied covenant to market, on which the jury found no damages, and remanded the case for attorney fees to be redetermined.[14] In all other respects, the court of appeals affirmed.[15]

## II

We begin with Salinas's contention that the incursion of hydraulic fracturing fluid and proppants into another's land two miles below the surface constitutes a trespass for which the minerals owner can recover damages equal to the value of the royalty on the gas thereby drained from the land. Coastal argues that Salinas has no standing to assert an action for trespass, and even if he did, hydraulic fracturing is not an actionable trespass. Because standing may be jurisdictional,[16] we address it first.[17]

## A

As a mineral lessor, Salinas has only "a royalty interest and the possibility of reverter" should the leases terminate, but "no right to possess, explore for, or produce the minerals."[18] Texas courts have occasionally stated that "[t]he gist of an action of trespass to realty is the injury to the right of possession."[19] Since Salinas has no possessory right to the minerals in Share 13, Coastal argues he has no standing to sue for trespass.

But courts have stated the rule too broadly. At common law, trespass included several actions directed to different kinds of wrongs.[20] Trespass *quare clausum fregit* was limited to physical invasions of plaintiff's possessory interest in land;[21] trespass on the case was not[22] and provided an action for injury to a non-

---

**14.** 166 S.W.3d 301, 330 (Tex.App.–Corpus Christi 2005).

**15.** *Id.* at 331.

**16.** *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex.2008) ("A court has no jurisdiction over a claim made by a plaintiff without standing to assert it."); *but cf. Allen v. Wright*, 468 U.S. 737, 750–752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (differentiating between the jurisdictional and prudential components of federal standing doctrine). This Court has not indicated whether standing is always a matter of subject-matter jurisdiction.

**17.** *Cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Without jurisdiction the court cannot proceed at all in any cause."); *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007) ("'[Steel Co.]* clarified that a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).").

**18.** *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 194 (Tex.2003).

**19.** E.g., *Pentagon Enters. v. Sw. Bell Tel. Co.*, 540 S.W.2d 477, 478 (Tex.Civ.App.–Houston [14th Dist.] 1976, writ ref'd n.r.e.); *see McMillan v. Dooley*, 144 S.W.3d 159, 188 (Tex.App.–Eastland 2004, pet. denied); *Lighthouse Church of Cloverleaf v. Tex. Bank*, 889 S.W.2d 595, 598 n. 3 (Tex.App.–Houston [14th Dist.] 1994, writ denied); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 833 S.W.2d 736, 739 (Tex.App.–Houston [1st Dist.] 1992, writ denied).

**20.** 1 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, Harper, James and Gray on Torts § 1.3, at 7 (3d ed. 2006) ("'Trespass' was really a 'family of writs' that summoned the defendant to show why ('ostensurus quare') he had done certain wrongs.").

**21.** *Id.* § 1.3, at 8; *Slye v. Guerdrum*, 29 App. D.C. 550 (1907) ("It is, of course, axiomatic that at common law the gist of the action of trespass *quare clausum fregit* is injury to the possession, and that, generally speaking, the plaintiff must show actual or constructive possession at the time of the trespass.").

**22.** Harper, *supra* note 20, § 1.3, at 9–10.

possessory interest, such as reversion.[23] Professors Prosser and Keeton explain:

> Thus a landlord cannot sue for a mere trespass to land in the occupation of his tenant. He is not without legal remedy, in the form of an action on the case for the injury to the reversion; but in order to maintain it, he must show more than the trespass—namely, actual permanent harm to the property of such sort as to affect the value of his interest.[24]

 Salinas's reversion interest in the minerals leased to Coastal is similar to a landlord's reversion interest in the surface estate. By his claim of trespass, Salinas seeks redress for a permanent injury to that interest—a loss of value because of wrongful drainage. His claim is not speculative; he has alleged actual, concrete harm whether his leases continue or not, either in reduced royalty revenues or in loss of value to the reversion.[25] This gives him standing to sue for a form of trespass,[26] and under our liberal pleading rules, unlike the common law, he was not required to specify which form. At common law, choosing the wrong form of action was fatal to the case, but modern civil procedure has abandoned such rigid dis-

---

**23.** *See Alexander v. Letson,* 242 Ala. 488, 7 So.2d 33 (1942); *Crowder v. Fordyce Lumber Co.,* 93 Ark. 392, 125 S.W. 417 (1910); *Gibbons v. Dillingham,* 10 Ark. 9 (1849); *Rogers v. Duhart,* 97 Cal. 500, 32 P. 570 (1893); *Halligan v. Chicago & Rock Island R.R. Co.,* 15 Ill. 558 (1854); *Brown v. Bridges,* 31 Iowa 138 (1870); *Pacific Ry. Co. v. Walker,* 12 Kan. 601 (1874); *Baltimore & Ohio. R.R. Co. v. Boyd,* 63 Md. 325 (1885); *French v. Fuller,* 40 Mass. 104 (1839); *Ware v. Collins,* 35 Miss. 223 (1858); *Burnett v. Thompson,* 52 N.C. (7 Jones) 407 (1860); *Casey v. Mason,* 8 Okla. 665, 59 P. 252 (1899); *Williams v. Goose Lake Valley Irrigation Co.,* 83 Or. 302, 163 P. 81 (1917); *Duffield v. Rosenzweig,* 144 Pa. 520, 23 A. 4 (1891); *Union Petrol. Co. v. Bliven Petrol. Co.,* 72 Pa. 173 (1872); *Greber v. Kleckner,* 2 Pa. 289 (1845); *Forsythe v. Price,* 8 Watts 282 (Pa.1839); *Stultz v. Dickey,* 5 Binn. 285 (Pa.1812); *Dial v. Gardner,* 104 S.C. 456, 89 S.E. 396 (1916); *Arneson v. Spawn,* 2 S.D. 269, 49 N.W. 1066 (1891); *Catlin v. Hayden,* 1 Vt. 375 (1829).

**24.** W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, Prosser and Keeton on the Law of Torts § 13, at 78 (5th ed.1984) (footnotes omitted); *see* Harper, *supra* note 20, § 1.2, at 5; *see also Gulf, Colo. & Santa Fe Ry. v. Settegast,* 79 Tex. 256, 15 S.W. 228, 230 (1891) ("The rule is well settled that the landlord may sue for and recover for damages to his reversionary interest; that is, he may bring an action for any permanent injury to the property."); *see generally* Restatement (First) of Property §§ 211 ("The owner of a future interest, in order to obtain any relief as against an act or omission to act of a third person, must establish that the conduct of such third person (a) is such conduct as would have been sufficient to entitle the owner of complete property in the affected thing, to some relief; and (b) causes either harm or reasonable apprehension of harm to such owner of a future interest in view of the character of the act or omission to act and of the substantiality of his future interest."), and 214 ("When conduct of a third person satisfies the requirements stated in § 211 and consists of acts or omissions to act affecting land, then (a) the owner of a future interest which consists of complete property in such land except for one or more prior estates for life is entitled to recover a judgment against the third person for the damages caused to the owner of the future interest by the conduct of such third person; and is entitled to the proceeds of such judgment. . . .").

**25.** *See also HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 890 (Tex.1998) ("A royalty interest is an interest in real property that is a distinct part of the mineral estate. Although royalty is payable only as minerals are produced, a royalty owner is entitled to compensation for damage to a reservoir underlying an oil and gas lease." (citations omitted)).

**26.** *DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299, 304–305 (Tex.2008) ("For standing, a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, not hypothetical." (footnotes omitted)).

tinctions.[27] It is important to note, however, that Salinas's claim of trespass does not entitle him to nominal damages (which he has not sought).[28] He must prove actual injury.

## B

Had Coastal caused something like proppants to be deposited on the surface of Share 13, it would be liable for trespass,[29] and from the ancient common law maxim that land ownership extends to the sky above and the earth's center below, one might extrapolate that the same rule should apply two miles below the surface.

But that maxim—*cujus est solum ejus est usque ad coelum et ad inferos*—"has no place in the modern world." [30] Wheeling an airplane across the surface of one's property without permission is a trespass; flying the plane through the airspace two miles above the property is not. Lord Coke, who pronounced the maxim, did not consider the possibility of airplanes.[31] But neither did he imagine oil wells. The law of trespass need no more be the same two miles below the surface than two miles above.

We have not previously decided whether subsurface fracing can give rise to an ac-

27. *See* HARPER, *supra* note 20, §§ 1.2, at 5 ("The distinction between the landlord's action, for damage to the reversion, and the tenant's action, for trespass, retains significance in modern times, despite the abolition of the distinction between the forms of action. Under contemporary rules of pleading, of course, neither the landlord's nor the tenant's action should be dismissed simply because it appears to have been brought in the wrong form. The older rule is important, however, since it affected the measure of damages recoverable in a way that still prevails."), and 1.3, at 11 ("Under the formulary system of the common law a plaintiff's suit could proceed in only one form of action; if the wrong form were chosen, plaintiff lost the case even if facts were shown that would entitle recovery in another form.... The hardships bred by the rigidity of this system finally led to the great procedural reforms of the mid-nineteenth century, which, among other things, abolished the distinctions between the old forms of action and provided for a single civil action in which the parties should be given their remedies (or defenses) according to the facts pleaded and proved under whatever legal theory the court found appropriate.").

28. *See* KEETON, *supra* note 24, § 13, at 75 ("The common law action of trespass could be maintained without proof of any actual damage.... The plaintiff recovered nominal damages where no substantial damage was shown.... On the other hand, the action on the case required proof of actual damage, and could not be maintained without it."); HARPER, *supra* note 20, § 1.2, at 5 ("The distinction between the landlord's action, for damage to

the reversion, and the tenant's action, for trespass, retains significance in modern times, despite the abolition of the distinction between forms of action. Under contemporary rules of pleading, of course, neither the landlord's nor the tenant's action should be dismissed simply because it appears to have been brought in the wrong form. The older rule is important, however, since it affected the measure of damages recoverable in a way that still prevails.").

29. *Glade v. Dietert*, 156 Tex. 382, 295 S.W.2d 642, 645 (1956) ("To constitute a trespass entry upon another's land need not be in person, but may be made by causing or permitting a thing to cross the boundary of the premises.") (internal quotes omitted).

30. *United States v. Causby*, 328 U.S. 256, 260–261 & n. 5, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) ("It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum.*" (citing 1 Coke, Institutes (19th ed. 1832) ch. 1, § 1(4a); 2 Blackstone, Commentaries (Lewis ed.1902) p. 18; 3 Kent, Commentaries (Gould ed. 1896) p. 621)). The maxim continued *"et ad inferos "*—to the depths.

31. *See also* HARPER, *supra* note 20, § 1.5, at 20 ("The maxim must be taken in the light of the actual decisions in which it found expression, and these all dealt with invasions of the airspace, close to the ground, that interfered with actual or potential use and occupation of the land (as by structures, trees, etc.).").

tion for trespass. That issue, we held in *Gregg v. Delhi–Taylor Oil Corp.*, is one for the courts to decide, not the Railroad Commission.[32] In 1961, when we decided *Gregg*, the Commission had never addressed the subject, and we specifically indicated no view on whether Commission rules could authorize secondary recovery operations that crossed property lines. The next Term, in *Railroad Commission of Texas v. Manziel*, we held that a salt water injection secondary recovery operation did not cause a trespass when the water migrated across property lines, but we relied heavily on the fact that the Commission had approved the operation.[33] Thirty years later, in *Geo Viking, Inc. v. Tex–Lee Operating Company*, we issued a per curiam opinion holding that fracing beneath another's land was a trespass,[34] but on rehearing we withdrew the opinion and expressly did not decide the issue.[35]

 We need not decide the broader issue here. In this case, actionable trespass requires injury,[36] and Salinas's only claim of injury—that Coastal's fracing op-

---

**32.** 162 Tex. 26, 344 S.W.2d 411, 415 (1961). Salinas points to language in our opinion that could be read to suggest that hydraulic fracturing below another's property constitutes an actionable trespass. For example, we offered that the allegations in that case were "sufficient to raise an issue" whether there was a trespass. *Id.* at 416. But we were not required to reach the issue.

**33.** 361 S.W.2d 560, 568–569 (Tex.1962). We stated:

We conclude that if, in the valid exercise of its authority to prevent waste, protect correlative rights, or in the exercise of other powers within its jurisdiction, the Commission authorizes secondary recovery projects, a trespass does not occur when the injected, secondary recovery forces move across lease lines, and the operations are not subject to an injunction on that basis. The technical rules of trespass have no place in the consideration of the validity of the orders of the Commission.

*Id.* We acknowledge that our opinions in *Gregg* and *Manziel* are in some tension and did not perfectly delineate the Commission's authority to regulate secondary recovery operations.

**34.** 839 S.W.2d 797 (Tex.1992) (No. D–1678) (per curiam op. withdrawn on reh'g) ("Although oil and gas are subject to legitimate drainage under the law of capture, the owner 'is accorded the usual remedies against trespassers who appropriate the minerals or destroy their market value.' *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 561 (1948). Fracing under the surface of another's land constitutes a subsurface trespass. *Gregg v. Delhi–Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411, 416 (1961); *Amarillo Oil v. Energy–Agri Products*, 794 S.W.2d 20, 27 (Tex.1990). Therefore, the rule of capture would not permit [an operator] to recover for a loss of oil and gas that might have been produced as the result of fracing beyond the boundaries of its tract.").

**35.** 839 S.W.2d 797, 798 (Tex.1992) (per curiam) ("The per curiam opinion and judgment of this court issued April 22, 1992 are withdrawn. Further, the order of this court of April 22, 1992, granting the application for writ of error is withdrawn, as the application was improvidently granted. In denying petitioner's application for writ of error, we should not be understood as approving or disapproving the opinions of the court of appeals analyzing the rule of capture or trespass as they apply to hydraulic fracturing.").

**36.** *See Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770, 773 (1945). As already noted, this case does not involve a trespass against a possessory interest, which does not require actual injury to be actionable and may result in an award of nominal damages. *See McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 621 (Tex.Civ.App.–Beaumont 1934, writ ref'd) ("[E]very unauthorized entry upon land of another is a trespass even if no damage is done or injury is slight, and gives a cause of action to the injured party."); *see also* RESTATEMENT (SECOND) OF TORTS § 163 (1965) ("One who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land [or] its possessor....").

eration made it possible for gas to flow from beneath Share 13 to the Share 12 wells—is precluded by the rule of capture. That rule gives a mineral rights owner title to the oil and gas produced from a lawful well bottomed on the property, even if the oil and gas flowed to the well from beneath another owner's tract.[37] The rule of capture is a cornerstone of the oil and gas industry and is fundamental both to property rights and to state regulation.[38] Salinas does not claim that the Coastal Fee No. 1 violates any statute or regulation. Thus, the gas he claims to have lost simply does not belong to him. He does not claim that the hydraulic fracturing operation damaged his wells or the Vicksburg T formation beneath his property. In sum, Salinas does not claim damages that are recoverable.

Salinas argues that the rule of capture does not apply because hydraulic fracturing is unnatural. The point of this argument is not clear. If by "unnatural" Salinas means due to human intervention, the simple answer is that such activity is the very basis for the rule, not a reason to suspend its application. Nothing is more unnatural in that sense than the drilling of wells, without which there would be no need for the rule at all. If by "unnatural" Salinas means unusual, the facts are that hydraulic fracturing has long been commonplace throughout the industry and is necessary for commercial production in the Vicksburg T and many other formations. And if by "unnatural" Salinas means unfair, the law affords him ample relief. He may use hydraulic fracturing to stimulate production from his own wells and drain the gas to his own property—which his operator, Coastal, has successfully done already—and he may sue Coastal for not doing so sooner—which he has also done, in this case, though unsuccessfully, as it now turns out.[39]

Salinas argues that stimulating production through hydraulic fracturing that extends beyond one's property is no different from drilling a deviated or slant well—a well that departs from the vertical significantly—bottomed on another's property, which is unlawful.[40] Both produce oil and

**37.** *Halbouty v. R.R. Comm'n.*, 163 Tex. 417, 357 S.W.2d 364, 374 (1962); *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 561 (1948); *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961, 964 (1945); *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935); *Stephens County v. Mid-Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S.W. 290, 292 (1923); *see also Houston & Tex. Cent. Ry. Co. v. East*, 98 Tex. 146, 81 S.W. 279, 280 (1904).

**38.** *See also* 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 1.1(A) (2d ed. 1998) ("The rule of capture may be the most important single doctrine of oil and gas law.").

**39.** In applying the rule of capture, the court of appeals drew a natural/unnatural distinction in *Peterson v. Grayce Oil Co.*, 37 S.W.2d 367, 370–374 (Tex.Civ.App.-Fort Worth 1931), *aff'd*, 128 Tex. 550, 98 S.W.2d 781 (1936), holding that drainage resulting from the use of vacuum pumps did not fall within the rule of capture because it did not "occur[] solely through the operation of natural agencies in a normal manner, as distinguished from artificial means applied to stimulate such a flow." But the distinction is either meaningless or circular because all extraction of oil and gas is by artificial means. In *Railroad Commission v. Manziel*, 361 S.W.2d 560, 568–569 (Tex.1962), we held that injecting water into a reservoir in a secondary recovery operation to increase production was not a trespass. The outcomes of these cases were different, not because water injection is less artificial than vacuum pumps, but because Railroad Commission rules allowed water injection and forbade vacuum pumps.

**40.** *Hastings Oil Co. v. Tex. Co.*, 149 Tex. 416, 234 S.W.2d 389, 398 (1950); 16 TEX. ADMIN. CODE § 3.37(m)(5) ("A well that is either bottomed off the lease, deviated after April 1, 1949, drilled in direct violation of a specific condition or limitation placed in the Rule 37 permit, or is in violation of a specific commis-

gas situated beneath another's property. But the rule of capture determines title to gas that drains from property owned by one person onto property owned by another. It says nothing about the ownership of gas that has remained in place. The gas produced through a deviated well does not migrate to the wellbore from another's property; it is already on another's property. The rule of capture is justified because a landowner can protect himself from drainage by drilling his own well, thereby avoiding the uncertainties of determining how gas is migrating through a reservoir.[41] It is a rule of expedience. One cannot protect against drainage from a deviated well by drilling his own well; the deviated well will continue to produce his gas. Nor is there any uncertainty that a deviated well is producing another owner's gas. The justifications for the rule of capture do not support applying the rule to a deviated well.

■ We are not persuaded by Salinas's arguments. Rather, we find four reasons not to change the rule of capture to allow one property owner to sue another for oil and gas drained by hydraulic fracturing that extends beyond lease lines.

First, the law already affords the owner who claims drainage full recourse. This is the justification for the rule of capture, and it applies regardless of whether the drainage is due to fracing. If the drained owner has no well, he can drill one to offset drainage from his property. If the minerals are leased and the lessee has not drilled a well, the owner can sue the lessee for violation of the implied covenant in the lease to protect against drainage.[42] If an offset well will not adequately protect against drainage, the owner (or his operator) may offer to pool, and if the offer is rejected, he may apply to the Railroad Commission for forced pooling.[43] The Commission may also regulate production to prevent drainage.[44] No one suggests that these various remedies provide inadequate protection against drainage.

■ Second, allowing recovery for the value of gas drained by hydraulic fracturing usurps to courts and juries the law-

---

sion order, is an illegal well and it shall not be permitted, and such well where permit is refused shall not be considered a replaceable well under commission replacement-well regulation.").

**41.** *Stephens County*, 254 S.W. at 292; *see Ryan Consol. Petrol. Corp. v. Pickens*, 155 Tex. 221, 285 S.W.2d 201, 210 (1955) (Wilson, J., joined by Hickman, C.J., and Garwood, J., dissenting) ("[T]he owner of the adjoining tract from which the oil is migrating can protect himself by drilling offset wells. This equal right to drill has always supported the constitutionality of the rule of capture. Take it away and the reason for the rule fails, leaving a result not only unjust but one inconsistent with the fundamental concept of ownership of oil and gas in place as a part of the realty.... Under our law no one has a right simply to capture the property of someone else. But because of early difficulty in determining the source of oil produced from a well we stopped judicial inquiry at the mouth of

the well, called it the rule of capture, and said that adjoining landowners could protect themselves by going and doing likewise. Admittedly this was a matter of expediency, and in the then state of the oil business and the then knowledge of reservoir dynamics, it reached a practical result.").

**42.** *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex.1981) ("The implied covenant to protect against drainage is part of the broad implied covenant to protect the leasehold. The covenant to protect the leasehold extends to what a reasonably prudent operator would do under similar facts and circumstances.").

**43.** Tex. Nat. Res.Code §§ 102.001–.112. *See Railroad Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36 (Tex.1991).

**44.** *Benz–Stoddard v. Aluminum Co. of Am.*, 368 S.W.2d 94 (Tex.1963).

ful and preferable authority of the Railroad Commission to regulate oil and gas production. Such recovery assumes that the gas belongs to the owner of the minerals in the drained property, contrary to the rule of capture. While a mineral rights owner has a real interest in oil and gas in place,[45] "this right does not extend to *specific* oil and gas beneath the property";[46] ownership must be "considered in connection with the law of capture, which is recognized as a property right"[47] as well. The minerals owner is entitled, not to the molecules actually residing below the surface, but to "a fair chance to recover the oil and gas in or under his land, *or* their equivalents in kind."[48] The rule of capture makes it possible for the Commission, through rules governing the spacing, density, and allowables of wells, to protect correlative rights of owners with interests in the same mineral deposits while securing "the state's goals of preventing waste and conserving natural resources".[49] But such rules do not allow confiscation; on the contrary, they operate to prevent confiscation.[50] Without the rule of capture, drainage would amount to a taking of a mineral owner's property—*the* oil and gas below the surface of the property—there-

by limiting the Commission's power to regulate production to assure a fair recovery by each owner. The Commission has never found it necessary to regulate hydraulic fracturing, a point to which we will return below, but should it ever choose to do so, permitting fracturing that extended beyond property lines, however reasonable in terms of industry operation, would be met with the objection that the Commission had allowed the minerals in the drained property to be confiscated. While "'all property is held subject to the valid exercise of the police power' and thus not every regulation is a compensable taking, . . . some are."[51] "Physical possession is categorically, a taking for which compensation is constitutionally mandated".[52] We need not hold here that without the rule of capture, all regulation of drainage would be confiscatory and thus beyond the Commission's power. We observe only that the rule of capture leaves the Commission's historical role unimpeded. "It is now well settled that the Railroad Commission is vested with the power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights."[53] The Commis-

---

**45.** *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935)

**46.** *Seagull Energy E & P, Inc. v. R.R. Comm'n.*, 226 S.W.3d 383, 388–389 (Tex. 2007) (emphasis added).

**47.** *Texaco, Inc. v. R.R. Comm'n*, 583 S.W.2d 307, 310 (Tex.1979); *see also Brown*, 83 S.W.2d at 940.

**48.** *Gulf Land Co. v. Atl. Ref. Co.*, 134 Tex. 59, 131 S.W.2d 73, 80 (1939) (emphasis added).

**49.** *Seagull Energy*, 226 S.W.3d at 389.

**50.** *Gulf Land*, 131 S.W.2d at 80.

**51.** *Seagull Energy*, 226 S.W.3d at 389; *accord Sheffield Dev. Co. v. City of Glenn Heights*, 140

S.W.3d 660, 670 (Tex.2004) (quoting *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984)).

**52.** *Sheffield Development Co.*, 140 S.W.3d at 669–670 (Tex.2004); *accord Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner. . . .").

**53.** *Texaco, Inc. v. R.R. Comm'n*, 583 S.W.2d 307, 310 (Tex.1979); *see Amarillo Oil Co. v. Energy–Agri Prods., Inc.*, 794 S.W.2d 20, 26 (Tex.1990) ("[T]he Commission would obviously have jurisdiction over the use of techniques to enhance production and protect

sion's role should not be supplanted by the law of trespass.

Third, determining the value of oil and gas drained by hydraulic fracturing is the kind of issue the litigation process is least equipped to handle. One difficulty is that the material facts are hidden below miles of rock, making it difficult to ascertain what might have happened. Such difficulty in proof is one of the justifications for the rule of capture. But there is an even greater difficulty with litigating recovery for drainage resulting from fracing, and it is that trial judges and juries cannot take into account social policies, industry operations, and the greater good which are all tremendously important in deciding whether fracing should or should not be against the law.[54] While this Court may consider such matters in fashioning the common law, we should not alter the rule of capture on which an industry and its regulation have relied for decades to create new and uncertain possibilities for liability with no more evidence of necessity and appropriateness than this case presents. Indeed, the evidence in this case counsels strongly against such a course. The experts in this case agree on two important things. One is that hydraulic fracturing is not optional; it is essential to the recovery of oil and gas in many areas, including the Vicksburg T formation in this case. (This fact has recently been brought to the public's attention because of development in the Barnett Shale in north Texas, which is entirely dependent on hydraulic fracturing.[55]) The other is that hydraulic fracturing cannot be performed both to maximize reasonable commercial effectiveness and to avoid all drainage. Some drainage is virtually unavoidable. In this context, common law liability for a long-used practice essential to an industry is ill-advised and should not be extended absent a compelling need that the Legislature and Commission have ignored. No such need exists.

Fourth, the law of capture should not be changed to apply differently to hydraulic fracturing because no one in the industry appears to want or need the change. The Court has received amicus curiae briefs in this case from the Railroad Commission, the General Land Office, the American Royalty Council, the Texas Oil & Gas Association, the Texas Independent Producers & Royalty Owners Association, the Texas Alliance of Energy Producers, Harding Co., BJ Services Co., Halliburton Energy Services, Inc., Schlumberger Technology Corp., Chesapeake Energy Corp., Devon Energy Corp., Dominion Exploration & Production, Inc., EOG Resources, Inc., Oxy Usa Inc., Questar Exploration and Production Co., XTO Energy, Inc., and Chief Oil & Gas LLC. These briefs from every corner of the industry—regulators, landowners, royalty owners, operators, and hydraulic fracturing service providers—all oppose liability for hydraulic

---

correlative rights."); TEX. NAT. RES.CODE § 86.081(a) ("For the protection of public and private interests, the commission, on written complaint by an affected party or on its own initiative and after notice and an opportunity for a hearing, shall prorate and regulate the daily gas well production from a common reservoir if the commission finds that action to be necessary to: (1) prevent waste; or (2) adjust the correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell the gas as permitted in this chapter."); *id.* § 85.202(a)(4) ("The rules and orders of the commission shall include rules and orders: ... to require wells to be drilled and operated in a manner that will prevent injury to adjoining property....").

**54.** *Texaco, Inc.*, 583 S.W.2d at 310 (Tex.1979) ("The business of producing, storing and transporting oil and gas is a business affected with a public interest....").

**55.** *E.g. Demand for Workers in the Barnett Shale on the Rise*, DALLAS BUS. J., June 23, 2008; Mary Fallin, *Hail the Shale*, NAT'L REV., July 2, 2008; Clifford Krauss, *There's Gas in Those Hills*, N.Y. TIMES, Apr. 8, 2008, at C 1.

fracturing, almost always warning of adverse consequences in the direst language.[56] Though hydraulic fracturing has been commonplace in the oil and gas industry for over sixty years, neither the Legislature nor the Commission has ever seen fit to regulate it, though every other aspect of production has been thoroughly regulated. Into so settled a regime the common law need not thrust itself.

Accordingly, we hold that damages for drainage by hydraulic fracturing are precluded by the rule of capture. It should go without saying that the rule of capture cannot be used to shield misconduct that is illegal, malicious, reckless, or intended to harm another without commercial justifica-

tion, should such a case ever arise. But that certainly did not occur in this case, and no instance of it has been cited to us.

## III

We turn now to Salinas's claims for breach of the implied covenant to protect against drainage, breach of the implied covenant to develop, and bad-faith pooling.

### A

Coastal had an implied obligation to act as a reasonably prudent operator to protect Share 13 from drainage, which could have been discharged by drilling offset wells to counter production on Share 12.[57] The jury found that Coastal failed to meet

---

**56.** *E.g.* Brief of American Royalty Council as Amicus Supporting Petitioners at 2 ("[W]hile the prevailing parties in the case below are royalty owners, the long-term effect of the court of appeals' decision is disastrous for royalty owners throughout Texas. If operators are faced with the possibility of tort liability when engaging in hydraulic fracturing, they will likely fracture fewer and fewer wells, with the ultimate effect of royalty owners losing out on hundreds of millions of dollars in royalties and the economy of the entire state weakened."); Brief of BJ Services Co., et al. as Amici Supporting Petitioners at 24 ("The [lower courts'] decisions do not reflect the law, they are wrong, and portend nothing short of chaos for oil and gas producers and related service companies in the State of Texas, perhaps in other oil and gas producing states as well."); Brief of Harding Co. as Amicus Curiae Supporting Petitioners at 2 ("[T]here is every reason to make it clear that the tort of trespass will not be allowed to imperil use of the sound practice of hydraulic fracturing. To do otherwise would be to impose massive costs on all segments of the Texas oil and gas industry and impede development and production of vitally needed oil and gas reserves."); Brief for Railroad Commission of Texas as Amicus Curiae Supporting Petitioners at 2 ("A judicial determination that a cause of action for subsurface trespass by fracture treatment exists in Texas would create a significant disincentive for oil and gas operators to continue to use and refine this longstanding and effective production

technique."); Brief for Texas General Land Office as Amicus Curiae Supporting Petitioners at 2 ("Recognizing a cause of action for subsurface trespass by fracture treatment is not only ill-advised from a public policy standpoint, it is neither warranted in practice nor necessary to protect mineral owners from drainage caused by subsurface fractures."); Brief for Texas Independent Producers and Royalty Owners Ass'n and Texas Alliance of Energy Producers as Amici Curiae Supporting Petitioners at 18 ("The impact of [a] ... holding that a cause of action for trespass by hydraulic fracturing exists ... will bring dramatic and adverse consequences to technology, to operators and to the Railroad Commission's ability to prevent waste."); Brief of Texas Oil & Gas Ass'n as Amicus Curiae Supporting Petitioners at 4 ("[L]egitimate hydraulic fracturing should never be considered a tortious activity. Holding otherwise would jeopardize secondary recovery operations that have been used for over fifty years and have contributed greatly to this nation's energy reserves.").

**57.** *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 253 (Tex.2004) ("An oil and gas lessee has an implied obligation to protect the leasehold from drainage. Local drainage occurs when oil migrates from under a lease to the well bore of a producing well on an adjacent lease. Drainage may be prevented by drilling an offset well. To establish a breach of the implied covenant to protect against drainage,

this obligation but was instructed to find as damages "[t]he value of the royalty on the gas drained from Share 13 by the subsurface trespass" by the Coastal No. 1 fracing operation, not the drainage a reasonably prudent operator should have prevented. The jury instruction assumes that a reasonably prudent operator on Share 13 should have prevented all drainage due to the fracing operation on the Coastal No. 1. Coastal complains that there is no evidence to support that assumption, that the jury should have been instructed to find as damages the value of the drainage that should have been prevented, and that there is no evidence of the amount of such drainage.

We have held that "[o]ne measure of damages" for breach of the implied covenant of protection is "the amount of royalties that the lessor would have received from the offset well on its lease."[58] But this would overcompensate the lessee if production from the offset well exceeded the drainage.[59] Another measure of damages is the value of the royalty on the drained gas,[60] but this, too, would overcompensate the lessee if not all of the drainage could have been prevented, either because of the nature of the field, or the regulatory system, or for whatever reason.[61] The correct measure of damages for breach of the implied covenant of protection is the amount that will fully compensate, but not

a lessor must show proof (1) of substantial drainage from the lessor's field, and (2) that a reasonably prudent operator would have acted to prevent the drainage."); *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981) ("[B]ecause of the complexity of the oil and gas industry and changes in technology, the courts cannot list each obligation of a reasonably prudent operator which may arise. The lessee must perform any act which a reasonably prudent operator would perform to protect from substantial drainage. The duties of a reasonably prudent operator to protect from field-wide drainage may include (1) drilling replacement wells, (2) re-working existing wells, (3) drilling additional wells, (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief. There is no duty unless such an amount of oil can be recovered to equal the cost of administrative expenses, drilling or re-working and equipping a protection well, producing and marketing the oil, and yield to the lessee a reasonable expectation of profit.").

**58.** *Kerr–McGee*, 133 S.W.3d at 253.

**59.** *See* 5 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW § 825.2, at 167 (2007) ("The 'amount-the-offset-well-would-produce' formula gives the lessor his royalty on production from the offset well, even though the well would produce far more oil or gas than

is being drained from the land. In short, there is no necessary correlation between the lessor's loss due to drainage and a recovery based on the amount of production from an offset well." (footnote omitted)).

**60.** *See Southeastern Pipe Line Co. v. Tichacek*, 977 S.W.2d 393, 399 (Tex.App.–Corpus Christi 1998), *aff'd in part and rev'd in part*, 997 S.W.2d 166 (Tex.1999) ("The measure of damages for breach of the drainage covenant is the royalty interest on the production lost by the producer's failure to prevent drainage. *Mandell v. Hamman Oil and Refining Co.*, 822 S.W.2d 153, 164 (Tex.App.–Houston [1st Dist.] 1991, writ denied); *County Management, Inc. v. Butler*, 650 S.W.2d 888, 890 (Tex.App.–Austin 1983, writ dism'd by agr.); *Wes–Tex Land Co. v. Simmons*, 566 S.W.2d 719, 721 (Tex.Civ.App.–Eastland 1978, writ ref'd n.r.e.).").

**61.** *See* WILLIAMS, *supra* note 59, § 825.2, at 166 ("The 'amount-drained-away' formula presupposes that the offset well would have prevented all drainage, which is not necessarily true. The location of the protection well, which may be determined by a regulatory agenda, will affect its efficacy in preventing drainage. Where it is determined that for physical reasons or by virtue of valid governmental order the offset well would not prevent all drainage, damage should be allowed only for the drainage that could have been prevented." (footnote omitted)).

overcompensate, the lessor for the breach—that is, the value of the royalty lost to the lessor because of the lessee's failure to act as a reasonably prudent operator.[62]

■■■ Salinas's expert testified to the total amount of drainage due to the fracing of the Coastal No. 1 well, but Salinas points to no evidence, much less conclusive evidence, that a reasonably prudent operator should have prevented all of that amount.[63] The jury instruction was therefore incorrect. There is also no evidence of what amount of drainage a reasonably prudent operator should have prevented. Absent any evidence of the proper measure of damages, Salinas cannot recover on its claim for breach of the protection covenant.

**B**

Coastal also had an implied obligation to continue to develop Share 13 with reasonable diligence after the M. Salinas No. 3 well was completed.[64] Salinas alleged that Coastal's delay in drilling additional wells breached that obligation, and the jury agreed. Salinas claimed to have lost the interest income the royalties would have produced had they been paid sooner, and the trial court instructed the jury to consider only that amount in determining damages. Coastal offered evidence that the delay in development actually benefitted Salinas because the price of gas was increasing over time, resulting in higher royalty payments that more than offset the interest earlier payments would have earned. Coastal argues here, as it did in the trial court, that the jury should have been instructed to find the difference between the value of what Salinas received and what he should have received, which Coastal contends is zero.

■■■ For breach of the development covenant, a lessee is entitled to recover "the full value of royalty lost to him".[65] The parties agree that whether Salinas suffered a loss from the delay is not a simple interest calculation but depends on prices and production rates. Earlier payments at lower prices plus interest may well be less than later payments at higher prices, as the current market illustrates. A royalty payment on a $50 barrel of oil which should have been paid last year, plus a year's interest, is far less than the same royalty on a $150 barrel of oil this year. But the trial court's instruction, in the context of the evidence and argument, did not prevent the jury from considering Coastal's position. Coastal reads the in-

---

62. *See Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 164 (Tex.App.–Houston [1st Dist.] 1991, writ denied) ("The measure of damages for breach of the drainage covenant was the royalty interest on the production lost by the producer's failure to prevent drainage.").

63. We have rejected the argument that a lessee should be held to a standard higher than a reasonably prudent operator when, as in this case, he is also the operator of the well that is draining the lessor's property. *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 569 (Tex. 1981) ("The reasonably prudent operator standard is not to be reduced to the [plaintiff lessors] because [their lessee] has other lessors in the same field. [The lessee's] status as a common lessee does not affect its liability to the [plaintiff lessors]."). *See generally* WILLIAMS, *supra* note 59, §§ 824–824.2 (discussing various arguments and authorities).

64. *See W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 29 (1929) ("Where a mining lease provided for oil or gas royalties, and failed to define the lessee's duty as regards development after discovery of paying oil or gas, the law implied the obligation from the lessee to continue the development and production of oil or gas with reasonable diligence.").

65. *Texas Pac. Coal & Oil Co. v. Barker*, 117 Tex. 418, 6 S.W.2d 1031, 1038 (1928).

struction to confine the jury's consideration to determining the amount of some two years' lost interest, without regard for other factors. But the instruction directed the jury to consider Salinas's lost interest *income,* and had they believed Coastal's evidence, they could have answered zero— Salinas lost interest on earlier royalties but lost no net income. Coastal made this plain in summation.[66] The instruction should have been clearer, but we cannot say that it prevented the jury from considering all the evidence.

■■■ Coastal also argues that there is no evidence to support the jury's answer of $1.75 million. The components of the damages calculation—past and projected production rates, prices, and the time value of money—were all essentially undisputed at trial, and the result should have been a straightforward matter of mathematics, but the parties' respective experts disagreed on how the calculation was to be made. It appears to us that Salinas's expert's calculations failed to credit Coastal with interest on past payments it made, but the record is not entirely clear, and we cannot conclude that Coastal conclusively established that Salinas was not damaged by a delay in development, or that Salinas offered no evidence of the amount of such damages.

■■■ Finally, Coastal contends that the trial court erred in refusing to ask the jury whether by suing to invalidate the leases, Salinas repudiated them, thereby suspending Coastal's development obligation.

The law is well-settled in Texas that "[l]essors who ... wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong." A lessor's repudiation of a lease relieves the lessee "from any obligation to conduct any operations, drilling, re-working, or otherwise, on said land in order to maintain the lease in force pending the judicial determination of the controversy ... over the validity of the lease." [67]

But Salinas argues that this rule applies only when a lessee suspends operations because of lease disputes, which Coastal did not do. Indeed, Coastal drilled eight additional wells on Share 13. Salinas contends that in these circumstances Coastal cannot assert repudiation as a defense to its delay in development. The parties' disagreement is legal, not factual, and Coastal has not asked us to resolve it. Coastal argues only that it was entitled to a jury finding on repudiation. Since none of the material facts was in dispute, no finding was necessary.

Accordingly, we reject Coastal's arguments regarding the development covenant, though for reasons that follow, we conclude that Coastal is entitled to a new trial.

---

**66.** Coastal's argument in summation, in part, was this: "[T]he fact of the matter is gas prices have increased and that means more dollars are being paid for gas today than they were, and that means more royalty is being paid today than it was.... Let's assume that the Plaintiffs took every single penny that they would have received had these wells been drilled earlier, every cent, and invested it, never spent it, never took it out of the bank, just invested it.... They're still 90 some thousand dollars ahead based upon the payment they are receiving now than this assumed payment that they could have gotten had we drilled earlier."

**67.** *Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 157 (Tex.2004) (footnotes omitted).

## C

The Salinas leases authorized Coastal to pool "at its option" whenever "in [its] judgment" pooling was "necessary or advisable . . . in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas." Salinas had no right to insist that Coastal exercise this broad discretion in any particular way, but Coastal was obliged to act in good faith,[68] which the jury found it failed to do. Coastal complains that there is no evidence to support that finding.

Coastal formed the M. Salinas Gas Unit to include the M. Salinas No. 2–V and No. 4 wells, thereby allowing the M. Salinas No. 8 to be drilled in the most advantageous location, closer to the No. 2–V than Commission Rule 37 would have permitted. Coastal was required to include some acreage outside Share 13 in the Unit but was free to determine the amount of that acreage and the size of the Unit. Coastal chose to make the Unit 80 acres in all, to include 7.357 acres from Share 12, and to include two wells on Share 13 but none on Share 12. As a result, Coastal owed Salinas royalties only on his pro rata share of production from the two wells— 72.643/80ths, or 90.80375%. Without the Unit, Salinas was due a royalty on all gas produced from both wells.

 Salinas argues that Coastal should have included only one Share 12 acre in the Unit, providing him the same benefit— the M. Salinas No. 8 well—but more royalties—on 79/80ths, or 98.75%, of production. Coastal counters that it was not required

to maximize the benefit to Salinas and disregard its own interests altogether, so long as it acted in good faith. As evidence of bad faith, Salinas points to Coastal's decision not to include the Coastal Fee No. 1 well in the Unit, which would have given Salinas a royalty on part of its production; the inclusion of the M. Salinas No. 4 well in the Unit, which was unnecessary to obtain favorable spacing for the M. Salinas No. 8 and freed Coastal from part of its royalty obligation; and the location of the M. Salinas No. 4 and No. 6 wells in less favorable locations to prevent drainage to the Coastal Fee No. 1 well. We agree with Salinas that this evidence supports the jury's finding.

The jury also found damages of $1 million, which the trial court reduced to $81,619, the total Salinas claimed. We would affirm the award except that we conclude, as we will explain, that there must be a new trial.

## IV

We come finally to two procedural issues raised by Coastal.

## A

Coastal contends that the trial court abused its discretion by admitting in evidence a 1977 internal memo regarding Share 13 title issues that referred to Salinas's predecessors as "mostly illiterate Mexicans", because under Rule 403 of the Texas Rules of Evidence, "the probative value [was] substantially outweighed by the danger of unfair prejudice". Coastal argues that the memo was irrelevant to

68. *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex.1999) ("A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause. For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. A lessee's pooling decision will be upheld unless the lessee pools in bad faith." (citations omitted)); *id.* at 171 ("Beyond the express terms of the lease, a lessor has no power to direct a lessee in its good faith pooling decisions. . . .").

any issue in the case, and that Salinas used it to inflame the all-Hispanic jury, as evidenced by their verdict, which included damage findings exceeding Salinas's claims, findings that Coastal's actions were malicious and criminal, and an assessment of $10 million punitive damages. Thus, Coastal argues that admission of the memo was reversible error.

Salinas offered the one-page memo to counter Coastal's position that any delay in development between 1993 and 1997 was due to Coastal's concerns that any further investment in the lease could be jeopardized by flaws in Salinas's title, and that provisions in the Share 15 leases could make it difficult to recoup royalties paid to the wrong owners. Since 1988, Share 13 owners had been involved in litigation with the Share 15 owners over the boundary between the two tracts.[69] The dispute was not addressed in the 1977 memo; the memo instead dealt with uncertainties in determining the Share 13 owners' respective interests in the property. Referring to a title opinion that had been prepared, the memo explained:

> The complex problems encountered by [the title examiner] result from the fact that possession of these lands began over 200 years ago and the people in possession were mostly illiterate Mexicans and later Mexican–Americans who had large families, many estate problems, heirship problems and errors of all kinds involving surveys and resurveys, partitions and attempted partitions.

Noting "the complete absence of base record title," the title examiner had concluded that "it would be extremely difficult, in fact almost impossible, for third parties who were not grantees in the Share 13 Deed or claiming thereunder to prevail if they sued" Coastal. Thus, the memo recommended that Coastal "assume the calculated risk of drilling [a] well" on Share 13. If the well were a producer, the memo continued, Coastal could "file an interpleader suit and let the court decide which parties are entitled to royalties and the percentages." That is exactly what Coastal did. When the M. Salinas No. 1 well was completed in 1978, Coastal filed an interpleader action, joining the various Share 13 owners. An agreed judgment resolving all issues was rendered in 1982.

Salinas argues that the memo was relevant to show Coastal's willingness to develop Share 13 despite title problems, undercutting its argument that delays were due to concerns over the Share 15 litigation. Of course, if Coastal's view of the Share 13 owners' pre–1982 title problems were indeed relevant, the undisputed facts established, without any need to refer to the memo, that those problems were not enough to stop Coastal from drilling on Share 13. Moreover, Coastal's assessment of those problems in 1977 suggests nothing about its assessment of a completely unrelated boundary dispute with the Share 15 owners that resulted in litigation some eleven years later. None of the issues discussed in the 1977 memo—the source of the title problems, the likelihood they could be exploited, and the risk of drilling—was remotely involved in the present case. Specifically, the source of the Salinas owners' long-since-resolved title problems had nothing whatever to do with this case. Salinas argues that the 1977 memo "form[ed] the foundation for Coastal's decision to side with" the Share 15 owners in that litigation "instead of remaining neu-

**69.** *Garza v. Maddux,* 988 S.W.2d 280 (Tex. App.–Corpus Christi 1999, pet. denied) (noting that the dispute over the tract had become clear by 1982, and thus, even if the discovery rule applied, limitations would bar plaintiffs' claim for deed reformation as a matter of law); *see supra* notes 6–8.

tral", but it did no such thing. Nothing in the memo suggests what Coastal's position might be in another lawsuit years later. Even if the memo indicated a general approach to title problems that might have influenced Coastal's position in the Share 15 boundary dispute, that position was also a matter of record and needed no proof. The 1977 memo added nothing material to the trial. It had no probative value.

But it did present a clear danger of unfair prejudice. The phrase, "illiterate Mexicans" could certainly be read as derogatory and not merely an unfortunate phrase included in describing the failure to maintain a clear record of title. The trial judge, Hon. Mario E. Ramirez, Jr., overruled Coastal's objection with this peculiar caveat: "It doesn't particularly inflame me." One of the plaintiffs, Margarito Salinas, testified on direct examination by his lawyer to a different reaction:

> Q. Let me hand you what's been marked Plaintiff's Exhibit 40 [the 1977 memo]. Do you recognize what that is?
>
> A. Yes, I do.
>
> Q. It has already been admitted into evidence, but when you saw that, how did you feel, Mr. Salinas?
>
> A. I feel infuriated, insulted because my ancestors were—are insulted in this memo, and it makes me really, really mad.
>
> \* \* \*
>
> Q. How did the rest of the family members feel when they heard or read that?
>
> A. Well, the same way. They feel hurt. They feel infuriated.

> Q. Do you feel this lawsuit was necessary?
>
> A. Yes, I do.
>
> Q. Why is that?
>
> A. Because Coastal was taking advantage at every turn.
>
> Q. Overall, what are your feelings about Coastal?
>
> A. I feel that Coastal has done a lot of wrong to us. They hurt us a lot and that's about it.

At that point Salinas's lawyer handed the memo to the jury.[70]

This questioning of one of the plaintiffs had nothing to do with title problems and development delays. It had only to do with prejudice. Nothing else in the record reflects that Salinas had any legitimate purpose in introducing the memo. The memo was mentioned only twice in the evidence, once in the passage just quoted, and once earlier, when Salinas' counsel asked Coastal's corporate representative, Thomas Sandefur, to identify the memo. After Sandefur testified that he was not acquainted with the author or recipients named in the memo, counsel then read the memo aloud. Counsel asked no other questions about the memo, and it was never mentioned again until summation.

One of Coastal's lawyers, Jose E. Chapa, Jr., devoted his entire argument to the memo, stating in pertinent part:

> I came up here to talk to you about one thing. I came up here to talk to you about a departmental memo that referred to the term "illiterate Mexican." You heard Mr. Salinas testify that he was offended by the term "illiterate Mexican." I'm sure some of you may

**70.** The court of appeals refused to consider the prejudicial effect of this testimony because Coastal failed to object to it. 166 S.W.3d 301, 324. Although Coastal failed to object and preserve any complaint about this testimony, we may still consider the testimony in resolving Coastal's argument regarding the relevance and prejudicial effect of the 1977 memo.

have been offended by the term "illiterate Mexican." I want to tell you that I'm offended by the term "illiterate Mexican." But I'm offended maybe for different reasons than the Plaintiffs are.

I'm offended, number one, because it has no bearing. It has nothing to do with this lawsuit. And I'm offended because intelligent Plaintiffs' attorneys would try to insult your intelligence. We all know that our ancestors, our pioneering ancestors, were people that were more about the land and not people of the letter. The reason this came about is because this term was used and this term was offensive, but way back then our people knew the land. Our people knew things that pertained to the land. Our people knew cattle. Our people knew the game and the wildlife. Our people knew farming. Our people knew ranching. Nobody cared to read or to write. That wasn't an insult. That's just the way it was. We survived. And how did we survive? We survived through knowing the land, through using the land. That's how we were able to overcome.

The memo about the illiterate Mexican really about collaterally. It came about collaterally because a low level Coastal employee was ordered to do a title search. And in doing this, he wrote this opinion, this 50–page title opinion. And in this opinion he traced the land change back to even the King of Spain, back to the sovereign. He traced it back probably 200 years ago. And 200 years ago, ladies and gentlemen, I would almost guarantee you that 80 percent of the gringos were illiterate. The landed gentry was illiterate. And that's testified through and proven through a lot of these deeds if you check at the courthouse are marked with an "X", la marca. Back then not knowing how to read or write was not a thing of dishonor. Back

then to place your mark on a piece of paper was your bond. It meant that you were going to abide by what you said. It meant that you were a man or a woman of honor. It meant that you were a person of the land, that knew the land and knew courage and knew survival.

Why have the Plaintiffs introduced this memo? Why have they done this? They've done this because they have no case. They've done this because the facts are against them. The Plaintiffs don't want you, ladies and gentlemen, to think about the facts. They just want you angry at us, angry at Coastal. They figure that if they can get you angry enough, then you are going to throw sound judgment out the window and that your decisions will be based on sentiment and not on reason. And we can't let them do that. To do that would break every rule of fairness that we stand for in this county and in this country. The Plaintiffs don't want an intelligent decision from you. The Plaintiffs just want you to punish us, to punish Coastal.

* * *

But I need to broach one other issue. Along with their lawyers, the Plaintiffs have been enriched in this case. "Nadie esta en la calle." Nobody is on the street, not the lawyers, not the Plaintiffs. You've heard that testimony. And they already have some, and they want more, and to give them more would just not be fair.

I am proud to be a Mexican American. I am proud to come from Mexican ancestry. I am proud to come from illiterate Mexican ancestry. That ancestry settled this country. That ancestry fought. That ancestry was courageous.

And because of that ancestry, I'm here and a lot of us are here today.

In response, Salinas's counsel, Ramon Garcia, closed with the following:

> Coastal is offended. First they are offended because of a memo that their own employees prepared, and it wasn't prepared way back then. It was prepared in 1977, not way back then. Now, they are offended—and I'm trying to talk about what they said. They already have some and now they are here wanting some more. . . .
>
> * * *
>
> Yeah, maybe at one time we were people of the land. But, you know, some of these people got educated. They learned how to read. They learned how to write. And the—you know, the thing about that memo is that it shows the attitude, the attitude on the part of the corporation. If you'll notice, the corporation did not bring in one person that received the memo, did not bring in the author of the memo to tell us what he really meant. No, they rely on . . . some of the lawyers that have nothing to do with this who are now coming in trying to explain something for this $10-billion corporation that didn't care enough to bring in the person that actually wrote the memo or received the memo so they can tell you what they really meant.
>
> Why are they referring to a—1977 to illiterate Mexicans? Why not just call them owners of the land, owners of the royalty interest? What was so special? Why? Because they were trying to posture themselves. They were then trying to put themselves in a position of, who are we going to help. And you look at those memos. Are we going to help Mr.

Coates [the Share 15 owner]? Oops. Are we going to help Mr. Coates up here, or are we going to help the [Salinases].

The evidence and argument establish that the only significance of the 1977 memo in the trial of this case was its use of the phrase, "illiterate Mexicans" to unfairly prejudice Coastal.

Evidentiary rulings are committed to the trial court's sound, not boundless, discretion. Because the significant danger of unfair prejudice presented by the memo substantially outweighed its probative value, which was zero, the trial court abused its discretion in admitting the memo in evidence. Salinas argues that Coastal waived its objection by addressing the memo in summation, but we have held that a party is entitled to explain or rebut evidence admitted over objection and is not required "to sit idly by and take its chances on appeal".[71] Salinas also argues that even if the memo should not have been admitted, the error was harmless because the memo was such a small part of the trial. But while the memo was mentioned only four times, we think the verdict shows that it was not without effect. Salinas asked for $544,000 damages for drainage; the jury found $1 million. Salinas asked for $81,619 damages for bad-faith pooling; the jury found $1 million. It is hard to see how damage findings of more than three times the total Salinas *claimed* were products of reasoned deliberations. The findings clearly did not turn on any relevant evidence in the case; rather, they exceeded even Salinas's evidence and we think must have been due to the prejudicial effect of the memo on the jury. The jury also found by clear and convincing evidence that Coastal acted with malice, which the trial court defined as specific intent to cause substantial injury or con-

71. *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 4 (Tex.1986).

scious indifference to others' rights. They found beyond a reasonable doubt that Coastal was guilty of felony theft, the effect of which was to remove statutory limits on punitive damages,[72] which the jury assessed at $10 million. In all, reviewing the entire record, we believe the verdict indicates that the effect of the memo was clearly to inflame the jury.[73]

Salinas never used the memo in any relevant way, only in a way calculated to create unfair prejudice. We think Salinas succeeded. We therefore conclude that the trial court's abuse of discretion in admitting the 1977 memo was harmful error and requires a new trial.

**B**

Coastal also contends that this action, filed in 1997, should have been abated while an earlier action, filed in 1988, proceeded. The earlier action, to which we have previously referred, involved a dispute over the boundary between Share 13 and Share 15, as well as claims that Coastal, the operator on Share 15, was draining Share 13 in that direction and had failed to develop Share 13. Most but not all of the plaintiffs in both cases were the same, and some of the defendants, including Coastal, were the same. In sum: the boundary claim in the earlier case had nothing to do with this case, the drainage claims in the two cases were legally similar but factually distinct, the development claims were more closely related but not identical, and the parties overlapped but were not the same.

 We have held that a later-filed suit must be abated "[w]hen there exists a complete identity of parties and controversies" between it and a earlier suit.[74] Otherwise, "[a]batement of a lawsuit due to the pendency of a prior suit is based on the principles of comity, convenience, and the necessity for an orderly procedure in the trial of contested issues",[75] matters committed to the sound discretion of the trial court in the first instance.[76] Coastal has provided no basis for us to conclude that the trial court in this case abused its discretion.

\* \* \* \* \* \*

We reverse the court of appeals' judgment, render judgment that Salinas take nothing on his claims for trespass and breach of the implied covenant to protect against drainage, and remand the remainder of the case for a new trial.

Justice WILLETT, concurring.

James Michener may well be right: "Water, not oil, is the lifeblood of Texas …"[1] But together, oil and gas are its muscle, which today fends off atrophy.

At a time of insatiable appetite for energy and harder-to-reach deposits—iron truths that contribute to $145 a barrel

---

72. *See* Tex. Civ. Prac. & Rem.Code § 41.008.

73. *See also Heddin v. Delhi Gas Pipeline Co.,* 522 S.W.2d 886, 889–890 (Tex.1975) (holding in a condemnation case that admission of "highly inflammatory" photos of the carcasses of livestock and pets killed in a natural gas pipeline rupture near the landowners' property "were not calculated to aid the jury in its understanding of the case" and "must be construed as an attempt to appeal to the prejudice and passion of the jury", which "was reasonably calculated to cause and probably did cause the rendition of an improper judgment.").

74. *Dolenz v. Continental Nat'l Bank,* 620 S.W.2d 572, 575 (Tex.1981).

75. *Wyatt v. Shaw Plumbing Co.,* 760 S.W.2d 245, 248 (Tex.1988).

76. *Dolenz,* 620 S.W.2d at 575.

1. James A. Michener, Texas v (1985).

crude and $4 a gallon gasoline [2]—Texas common law should not give traction to an action rooted in abstraction. Our fast-growing State confronts fast-growing energy needs, and Texas can ill afford its finite resources, or its law, to remain stuck in the ground. The Court today averts an improvident decision that, in terms of its real-world impact, would have been a legal dry hole, juris-imprudence that turned booms into busts and torrents into trickles. Scarcity exists, but *above*-ground supply obstacles also exist, and this Court shouldn't be one of them.

* * * * * *

Efficient energy production is profoundly important to Texas and to the nation:

- *Reserves*: Texas leads the nation in fossil fuel reserves (accounting for nearly a quarter of U.S. oil reserves and nearly 30% of natural gas reserves).[3]
- *Production*: Texas is also the top domestic producer of both oil and natural gas (generating 20% of the nation's crude and 28% of its natural gas).[4]
- *Refining*: Texas' twenty-five petroleum refineries represent "more than one-fourth of total U.S. refining capacity." [5]

- *Consumption*: Texas is not only the leading energy-producing state, but, given its large population and energy-intensive economy, is also the most power-hungry ("accounting for 11.5 percent of all U.S. energy use").[6]
- *State Oil–and–Gas Tax Revenue*: While high energy prices inflict acute pain on everyday consumers, tax receipts from oil and gas production have surged 58% and almost 30%, respectively, from just a year ago, "and higher energy royalties also have boosted Texas' educational endowments." [7] The four public funds that receive oil and gas revenues—the general state revenue fund, the Rainy Day Fund, the Permanent School Fund, and the Permanent University Fund—have all jumped significantly this fiscal year, "posting growth of at least 30 percent and up to 84 percent over the prior year." [8]

On both the supply and demand side, we inhabit an energy world transformed, and the data are growing increasingly sober:

- "[T]he days of near-total reliance on cheap and abundant fossil fuels may be drawing to a close." [9]

2. Energy Information Administration, Short–Term Energy Outlook, http://www.eia.doe.gov/steo (last visited Aug. 27, 2008). Fortunately, these all-time record highs from mid-July 2008 have fallen slightly. On August 27, 2008, the per-barrel price of light, sweet crude for October delivery settled at $118. New York Mercantile Exchange, Home, http://www.nymex.com/index.aspx (last visited Aug. 27, 2008). On the retail side, Texas motorists paid an average of $3.48 that day for a gallon of regular unleaded. American Automobile Association, Daily Fuel Gauge Report, http://www.fuelgaugereport.com/TXavg.asp (last visited Aug. 27, 2008).

3. Energy Information Administration, State Energy Profiles: Texas, http://tonto.eia.doe.gov/state/state_energy_profiles.cfm?sid=TX (last visited Aug. 27, 2008).

4. *Id.*

5. *Id.*

6. Texas Comptroller of Public Accounts, The Energy Report 2008, at 4–5 (2008), *available at* http://www.window.state.tx.us/specialrpt/energy [hereinafter Texas Energy Report].

7. Clay Robison, *High Oil Prices Bring a Mixed Bag for Texas' Economy*, Houston Chron., July 1, 2008, at B1.

8. Dan Zehr, *Fuel Prices Good for Texas?*, Austin Am.-Statesman, July 4, 2008, at A1.

9. Texas Energy Report, *supra* note 6, at 403.

The U.S. has large undeveloped fossil-fuel deposits—undeveloped because of congressional drilling moratoria—and imports roughly 60% of its oil,[10] much of it from unstable (and unfriendly) areas riven with geopolitical strife.[11]

· Energy companies are experiencing sharp drop-offs in production despite triple-digit crude prices (an impetus to aggressive exploration).[12]

· The drilling of exploratory wells surged 138% from 2000 to 2007,[13] but domestic oil production fell 12.4% over the same period, to levels not seen since 1947.[14]

· Texas oil and gas production continues to fall from its peak production period in the early 1970s. "[I]n recent years Texas crude oil output has fallen to less than one-third of its 1972 peak." Natural gas production also peaked in 1972, and "output has declined steadily to less than three-fifths of that level." [15]

**10.** Energy Information Administration, Energy in Brief: May 1, 2008, http://tonto.eia.doe.gov/energy_in_brief/foreign_oil_dependence.cfm (last visited Aug. 27, 2008).

**11.** One scholar laments that "oil wealth often wreaks havoc on a country's economy and politics, helps fund insurgents, and aggravates ethnic grievances ... Today, with violence falling in general, oil-producing states make up a growing fraction of the world's conflict-ridden countries ... The number of oil-producer-based conflicts is likely to grow in the future as stratospheric prices of crude oil push more countries in the developing world to produce oil and gas." Michael Ross, *Blood Barrels: Why Oil Wealth Fuels Conflict*, FOREIGN AFFAIRS, May–June 2008, *available at* http://www.sscnet.ucla.edu/polisci/faculty/ross/BloodBarrelsFA.pdf.

**12.** Consider this opening sentence from a recent front-page article atop *The Wall Street Journal:* "The world's premier energy monitor is preparing a sharp downward revision of its oil-supply forecast, a shift that reflects deepening pessimism over whether oil companies can keep abreast of booming demand." Neil King, Jr. & Peter Fritsch, *Energy Watchdog Warns of Oil–Production Crunch*, WALL ST. J., May 22, 2008, at A1. The leader of the study warns, " 'This is a dangerous situation.' " *Id.* (quoting Fatih Birol). It is notable that Irving–based Exxon Mobil, the world's largest private oil company, has seen two straight quarters of tumbling oil and gas production, despite spending billions more than in previous years on finding and producing from new fields. Clifford Krauss, *Exxon's Second–Quarter Earnings Set a Record*, N.Y. TIMES, Aug. 1, 2008 at C2. The production problems are industry-wide: "Adding together

the output of all the major international oil companies, including Chevron, Conoco, BP, Shell, Total and Exxon, this appears to be the fourth straight quarter of production declines, according to Barclays Capital analysts. Barclays said the total decline might exceed 600,000 barrels a day, reflecting the difficulties the oil companies had in gaining access to new regions to make up for the decline of mature fields." *Id.* "With new finds rare and the best sources in countries that limit Western investors, crude oil is no longer viewed as the abundant, dominant fuel it once was." Russell Gold, *Exxon's $10.89 Billion Net Disappoints Investors, Fuels Gathering Political Storm*, Wall St. J., May 2, 2008, at B1.

**13.** Energy Information Administration, U.S. Crude Oil Field Production, http://tonto.eia.doe.gov/dnav/pet/hist/mcrfpus1A.htm (last visited Aug. 27, 2008). Drilling activity in Texas is also surging. Texas Railroad Commissioner Victor Carrillo recently predicted "the state should see about 24,000 drilling permits this year, the most since 1985." Jim Fuquay, *Texas Execs Speak Out About High Energy Costs' Sting*, FT. WORTH STAR-TEL., Aug. 22, 2008, at 3C.

**14.** Energy Information Administration, U.S. Crude Oil, Natural Gas, and Dry Exploratory and Developmental Wells Drilled, http://tonto.eia.doe.gov/dnav/ng/hist/e_ertw0_xwcd_nus_cA.htm (last visited Aug. 27, 2008).

**15.** Energy Information Administration, *supra* note 3. The Texas Energy Planning Council, charged with helping Texas meet its energy demands in the 21st century, reported that "Texas' oil and gas production is quite mature, with marginal wells accounting for a third of statewide production." TEXAS ENERGY

The world will doubtless diversify its energy profile in coming decades to reduce reliance on carbon-emitting fuel sources, but even assuming major advances in both efficiency and alternative sources, fossil fuels will still meet as much as 80% of global energy demand through 2030.[16]

Bottom line: We are more and more over a barrel as "our reserves of fossil fuels are becoming harder and more expensive to find."[17] Given this supply-side slide, maximizing recovery via fracing is essential; enshrining trespass liability for fracing (a "tres-frac" claim) is not. I join today's no-liability result and suggest another reason for barring tres-frac suits: Open-ended liability threatens to inflict grave and unmitigable harm, ensuring that much of our State's undeveloped energy supplies would stay that way—undeveloped. Texas oil and gas law favors drilling wells, not drilling consumers. Amid soaring demand and sagging supply, Texas common law must accommodate cutting-edge technologies able to extract untold reserves from unconventional fields.

Two additional comments on the Court's decision:

First, it nixes trespass-by-frac suits for drainage (the only damages sought here) by invoking the rule of capture. I agree such suits would subvert this time-honored rule, but I would foreclose them a half-step sooner under the same "balancing of interests" approach we applied to subsurface fluid injection nearly a half-century ago in *Railroad Commission of Texas v. Manziel.*[18] Such encroachment isn't just "no actionable trespass"; it's no trespass at all. As a practical matter, the distinction between "no actionable trespass" and "no trespass" may seem more rhetorical than real: recovery is denied either way. But orthodox trespass principles that govern surface invasions seem to me to have dwindling subterranean relevance, particularly as exploration techniques grow ever sophisticated. Given the pace of innovation, fueled by spiraling demand in a supply-constrained world, I would confront Lord Coke's maxim directly and decide whether land ownership indeed "extends to the sky above and the earth's center below,"[19] or alternatively, whether that ancient doctrine "'has no place in the modern world.'"[20] The Court says there is no actionable trespass because there is no injury, and there is no injury because the rule of capture says so: "the gas he claims to have lost simply does not belong to him."[21] True, you cannot recover actual damages for trespass absent injury, but I would approach this case not as the Court does today but as the Court did in *Manziel,* focusing not on the injury caused by the alleged trespass but on whether the

PLANNING COUNCIL, TEXAS ENERGY PLAN 2005, at 15 (Dec.2004), *available at* http://www.rrc.state.tx.us/tepc/; *see also* John W. Broomes, *Wrestling with a Downhole Dilemma: Subsurface Trespass, Correlative Rights, and the Need for Hydraulic Fracturing in Tight Reservoirs,* 53 ROCKY MTN. MIN. L. INST. 20-1, at 20-6 (2007); Terry D. Ragsdale, *Hydraulic Fracturing: The Stealthy Subsurface Trespass,* 28 TULSA L.J. 311, 335 (1993).

**16.** INTERNATIONAL ENERGY AGENCY, WORLD ENERGY OUTLOOK 2006, at 38 (2006), *available at* http://www.worldenergyoutlook.org/2006.asp.

**17.** Bruce Wright, *The Texas Portfolio,* FISCAL NOTES: SPECIAL ENERGY ISSUE, Apr. 2008, at 1, *available at* http://www.window.state.tx.us/comptro l/fnotes/fnEnergy08/fnEnergy08.pdf.

**18.** 361 S.W.2d 560 (Tex.1962).

**19.** 268 S.W.3d at 11.

**20.** *Id.* at 11 (quoting *United States v. Causby,* 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)).

**21.** *Id.* at 13.

underlying act was wrongful to start with.[22] Injury is the *result* of trespass, not part of its definition, and this case should turn not on the absence of injury but on the absence of wrongfulness. Balancing the respective interests as we did in *Manziel,* this type of subsurface encroachment, like the waterflood in *Manziel,* simply isn't wrongful and thus isn't a trespass at all, not just a nonactionable trespass.

Second, the Court implicitly leaves trespass as a potentially viable theory in suits seeking "nondrainage" damages,[23] for example, when a reservoir or nearby drilling equipment is damaged. But plaintiffs alleging nondrainage injuries already have a ready theory: negligence. In such cases, where the rule of capture is inapposite, I would end definitively any lingering flirtation of Texas law with equating hydraulic fracturing with trespass. I would say categorically that a claim for "trespass-by-frac" is nonexistent in either drainage or nondrainage cases.

As for the dissent, it would take an indispensable innovation in an indispensable industry[24] and make it a tort. In doing so, it would usurp the Railroad Commission's vast authority to oversee, through carefully balanced regulations, the production of oil and gas in this State, and replace that legislatively conferred discretion with wide-open tort liability for an essential recovery practice used in every producing region of Texas. It would take a meat-ax approach to a task that demands scalpel-like precision, all to address a problem that, even assuming it exists, surely has better solutions. The dissent's view would invite a nightmarish flood of litigation over unknowable facts. It would slow the spigot and make it far tougher to find that next barrel of crude, that next cubic foot of natural gas, particularly in less-desirable pockets. It would reward the free rider who would rather sue for trespass than drill his own well. And it would do all this at the worse possible time-one of falling production, surging demand, and near-record-high prices for both crude oil and gasoline. Under the dissent, the newest "enhanced-recovery technique" would be a wildcatting plaintiff who sues for multi-millions after his neighbor fracs a well. Why hire a drilling contractor and field geologist to drill an unsightly and unpredictable offset well when you can go for a gusher in the courtroom? Just hire a lawyer and retain a testifying expert who can summarize with mind-boggling precision the fluid dynamics and fracture geometry that transpired beneath millions of tons of earth.

## I. A Comment on the Court's Decision

### A. Another Reason for Barring Trespass–by–Frac Suits: Unbounded Tort Liability Would Impose Exorbitant Costs on Society

Although it disallows tres-frac damages under the rule of capture, the Court is unconvinced that tort exposure would necessarily crimp production and inflict broad-based economic harm. I am not

---

**22.** *Manziel,* 361 S.W.2d at 566–69; *see also Lyle v. Waddle,* 144 Tex. 90, 188 S.W.2d 770, 773 (1945) (distinguishing the wrongful act that constitutes trespass from the harm caused by the trespass). Black's Law Dictionary captures this view, defining "trespass" as an "unlawful act committed against the person or property of another; esp., wrongful entry on another's real property." Black's Law Dictionary 1541 (8th ed.2004).

**23.** 268 S.W.3d at 10–11.

**24.** The oil and gas industry is a mainstay of the Texas economy. Its share of gross state product was 15.7% in 2006, when it employed more than 312,000 Texans who earned almost $31 billion in total wages. Texas Energy Report, *supra* note 6, at 29–30.

nearly so sanguine. The dire alarms sounded in the amicus curiae briefs, including one from the State's oil and gas regulatory body, strike me as more factual than fanciful.

The amici depict a grim future for the Texas energy industry and economy if we permit trespass-by-frac lawsuits. These warnings—from public and private observers alike-counsel pause before we declare into existence a tort action they insist will undeniably imperil production. The Share 13 Plaintiffs label these concerns "a 'sky is falling' Chicken Little refrain," but if the warnings sound overwrought, it may be because, in this case, style is inextricable from substance: Allowing trespass-by-frac suits to impede what is perhaps the single most essential technique in modern oil and gas production would be a calamitous mistake.

### i. Tres–Frac Liability Would Squeeze Much–Needed Production

The views of one amicus curiae merit particular attention: the Railroad Commission, legislatively commanded to superintend the Texas energy industry and given jurisdiction over each and every one of our State's 200,000–plus producing oil and gas wells.[25]

As to its irreplaceable role in modern energy exploration, fracing, says the Railroad Commission, is:

- "often necessary to maximize production and assure that the oil and gas reserves ... are not left in the ground";
- "used widely and prolifically throughout Texas as a production technique";

- "a vital component of oil and gas production in Texas and, in those parts of the state where tight sands and shale formations are found, it is absolutely essential to the economic production of oil and gas"; and
- responsible for "the production of large quantities of oil and gas that otherwise would never have been recovered."

As to the devastating blow that tort liability would impose, such exposure, according to the Commission, would:

- "create a significant disincentive for oil and gas operators to continue to use and refine this longstanding and effective production technique";
- "result in many fewer wells being drilled and substantially decreased oil and gas production in Texas"; and
- "impede the exploration and development of, and lead to the 'waste' of, our state's oil and gas resources, a result that is completely contrary to the fundamental concept of oil and gas conservation and our agency's mission to support enhanced development and economic vitality for the benefit of Texans."

Fracing is not a luxury, but a must-have recovery tool that is vital today and will remain vital tomorrow (along with other promising recovery technologies). Easy-to-produce reserves are increasingly uncommon, and meeting spiking demand requires advanced techniques to make uneconomical fields economical.

Exhibit A is a huge expanse of dense, gas-bearing rock called the Barnett Shale, spanning about 5,000 square miles across several north central Texas counties.[26] The nation's most active drilling basin,

---

**25.** Tex. Nat. Res.Code § 81.051(a)(2).

**26.** Railroad Commission of Texas, Barnett Shale Information, http://www.rrc.state.tx.us/ barnettshale/index.html (last visited August 27, 2008).

home to more than 7,500 producing gas wells, the Barnett Shale is considered by some experts to be the largest and most prolific natural gas field in the continental United States, producing an estimated three billion cubic feet of natural gas every day.[27] However, the Barnett Shale, as its name implies, is known for its unforgiving shale, and "technological improvements in recovery methods"—*i.e.*, fracing innovations—are widely credited with sparking the so-called Barnett Shale boom, which created an estimated 83,823 jobs in 2007 alone, injecting more than $8.2 billion into the local economy and almost $1.1 billion into state and local tax coffers.[28] One current railroad commissioner calls the Barnett Shale the "shining star" of modern energy-production success stories and adds "[a]dvanced exploration techniques have transformed this once marginal trend into a giant."[29] The Railroad Commission itself has stated: "The success of the Barnett Shale is in large part a result of the use of stimulation technology," namely hydraulic fracturing.[30] The Commission's amicus brief notes that for many years after its initial discovery, "the field was considered uneconomic or only marginally

economic," and the spike in activity and production "are largely attributable to the development of a specialized fracture stimulation technique that has allowed operators to 'unlock' the gas trapped for millennia." This success, in turn, has prodded exploration elsewhere. As the Comptroller's May 2008 Texas Energy Report states, "The success of the Barnett Shale production zone has spurred efforts to produce gas in many other areas and geological formations that were previously considered unrecoverable or uneconomic."[31] The importance of fracing to Texas fields like the Barnett Shale and the Vicksburg T is impossible to overstate; vast energy supplies are being recovered from areas long thought to be depleted (or else passed over because of low native permeability).[32]

Fracing is required but also imprecise. As the Court notes, we are talking about fissures of immeasurable length and uncontrollable direction. Whether a fracture's effective length actually crossed an adjacent lease line miles beneath the Earth's surface cannot be determined until after the fact.[33] As for controlling a frac-

27. TEXAS ENERGY REPORT, *supra* note 6, at 68 ("The Barnett Shale is one of the most active natural gas production zones in the state and the nation."); Clifford Krauss, *There's Gas in Those Hills*, N.Y. TIMES, Apr. 8, 2008, at C 1.

28. *Study: Barnett Shale Boosting North Texas Economy*, DALLAS BUS. J., Mar. 28, 2008. As the Railroad Commission recently noted, "The Barnett Shale must be stimulated—treated to increase permeability—in order for the field to be economic." Railroad Commission of Texas, Water Use in the Barnett Shale, http://www.rrc.state.tx.us/divisions/og/wateruse_barnettshale.html (last visited Aug. 27, 2008) [hereinafter "Water Use"].

29. Elizabeth Ames Jones, Op–Ed., *Energy Security 101*, WASH. POST, Oct. 9, 2007, at A17.

30. Water Use, *supra* note 28.

31. TEXAS ENERGY REPORT, *supra* note 6, at 68. "The largest issue involving natural gas is supply." *Id.* at 77. Without "continuing advancements in technology, natural gas producers may find it more difficult to keep producing adequate supplies." *Id.* This supply pinch must be mitigated by innovation, explaining why "Texas producers now pursue unconventional gas plays throughout the onshore part of the state, fracturing rock formations with sand-bearing liquids to expand the gas-producing areas underground." *Id.*

32. *See, e.g.*, Krauss, *supra* note 27, at C1.

33. As described by plaintiffs' expert, who has written several books in this area, a fracture's *effective* length is shorter than its initial propped length. Even if the induced fracture crossed over the lease line momentarily, and even if experts had the wherewithal to confirm as much, who is to say the effective

ture's precise direction, plaintiffs' lead expert conceded there is no way to do so: "the fracture azimuth is preordained. There is very little that we can do to affect the fracture orientation." Creating a fracture is itself a geological and engineering marvel; controlling its length and direction (in three dimensions) is simply beyond present capabilities.

Risk-taking entrepreneurs contend daily with such uncertainties, but Texas law deserves greater predictability than permitting exemplary damages for invisible torts. Because operators of fraced wells lack absolute control, the specter of tort liability will convince many rational operators to forego fracing altogether and leave otherwise recoverable resources in the ground, to the detriment of the State as a whole. It defies belief that exposure to exemplary tort damages will do anything other than sharply curtail fracing and sharply curtail production (thus reducing supply, thus pushing up prices ... for everything).[34]

We wisely took into account similar policy concerns in *Manziel*, where we rejected trespass liability for a waterflood that breached lease boundaries. We found it "obvious that secondary recovery programs could not and would not be conducted if any adjoining operator could stop the project on the ground of subsurface trespass."[35] The Railroad Commission urges the Court to accommodate real-world concerns here "as it has in the past," urging us to "give careful consideration to the policy implications of a decision recognizing a new cause of action." Like recovery by waterflood, recovery by fracturing is key to maximizing recovery.

### ii. Less Fracing Means Less Tax and Royalty Revenue for Texas

Robust energy production enriches Texas' fiscal bottom line. In fiscal year 2007, severance taxes on oil and gas production produced more than $2.7 billion for the State, about 7% of all tax revenue, and preliminary figures for the current year suggest revenues may surpass $3 billion.[36]

portion of the fracture—the part that actually captures oil and gas from the reservoir—did not remain completely within Coastal's Share 12 lease boundaries? Plaintiffs made no attempt to determine the fracture's effective length in this case. Because drainage occurs exclusively via this *effective* frac length, not the original frac penetration length, liability, if at all, must reasonably be limited to trespass that inflicts actual injury—drainage—not an encroachment that produces no ill effect. This is particularly true where, as here, plaintiffs alleged felony theft in an attempt to avoid the statutory cap on punitive damages. *See* Tex. Civ. Prac. & Rem.Code § 41.008(b)(1), (c)(13). Only the fracture's *effective* length, not its hydraulic or propped lengths, speaks to whether the fracture is actually draining hydrocarbons. The cross-examination of Dr. Economides on this point was illustrative. Although he "estimated" that 25–35% of the fracture penetrated plaintiffs' property, plaintiffs' expert made no attempt to measure its *effective* length, the part that actually captures minerals and inflicts the complained-of injury: "I did not do any other elaborate calcula-

tion in terms of drainage and interference or whatever else."

34. Under the rules, a well may be as close as 467 feet from a lease line, but given that the center of a forty-acre square tract (the smallest permitted size) is only 660 feet from its edge, an operator realistically has no risk-free place to drill a fraced well without facing possible trespass liability. *See* 16 Tex. Admin.Code § 3.37 (spacing rules); *see* Laura H. Burney & Norman J. Hyne, *Hydraulic Fracturing: Stimulating Your Well or Trespassing?* 44 Rocky Mtn. Min. L. Inst. 19–1, at 19–14 (1998) (estimating the length of a fracture in tight sand reservoir at a few thousand feet); *see also* Ragsdale, *supra* note 15, at 338 n. 128 (noting that a typical fracture runs 2,500 to 4,500 feet from the wellbore).

35. *R.R. Comm'n of Tex. v. Manziel*, 361 S.W.2d 560, 568 (Tex.1962).

36. Zehr, *supra* note 8, at A1; Texas Comptroller of Public Accounts, Texas Net Revenue by

In addition, drilling on State lands annually generates millions in oil and gas royalty revenue for the State's general fund.[37]

The two state agencies most involved in oil and gas production see ominous fiscal threats posed by tres-frac liability. As to tax revenue, the Railroad Commission contends that increased litigation exposure would ratchet up exploration costs and "result in a significant impact on the state's revenues generated from oil and gas production." As to royalty revenue, the General Land Office (GLO), which oversees twenty million acres of State-owned minerals, underscores that the State's lease of drilling rights to energy firms sends hundreds of millions of dollars annually in royalty revenue to the Permanent School Fund to help finance Texas public schools (thus "reducing the need for tax revenue" by offsetting local property taxes). Although GLO, constitutionally charged with maximizing revenue from State-managed lands, might see a trespass cause of action as a *positive* development—after all, Texas could be a plaintiff in these cases—the agency worries that such exposure "will create a significant impediment to the aggressive exploration and development of Texas' oil and gas reserves" and "will result in waste as operators, seeking to avoid tort liability, leave otherwise recoverable reserves in the ground rather than perform the fracture treatments necessary to produce economically."[38] The upshot,

GLO insists, will be ruinous: "Fewer wells drilled will mean less development of the oil and gas reserves underlying State lands, which means less royalty revenue for the Permanent School Fund."

### iii. Texas Statutory and Common Law Suggest the Court's Decision Should Be Informed by Concern for the Public Good

The interplay of common-law trespass and oil and gas law must be shaped by concern for the public good. In *Hastings*, we recognized a trespass cause of action to combat slant-hole drilling as "in line with the public policy of this state."[39] In *Manziel*, we stated that "[s]econdary recovery operations are carried on to increase the ultimate recovery of oil and gas," and that "[i]t cannot be disputed that such operations should be encouraged."[40] If anything, encouraging the use of leading-edge technology is a greater concern today than in 1962 when *Manziel* was decided. Hydraulic fracturing involves unique practical and policy considerations that Texas common law cannot ignore.

Our statutory law certainly doesn't. The Legislature, consistent with its focus on maximizing recoverable reserves, affirmatively champions fracturing by granting severance tax exemptions for production from dormant oil and gas wells brought back into production and from fields the

---

Source–Fiscal 2007, http://www.window.state.tx.us/taxbud/revenue.html (last visited Aug. 27, 2008); *see also* TEXAS ENERGY REPORT, *supra* note 6, at 30–31.

37. Texas Comptroller of Public Accounts, Biennial Revenue Estimate (2008–2009), http://www.window.state.tx.us/taxbud/bre2008/html/sched_I_GR.html (last visited Aug. 27, 2008).

38. The Legislature has declared waste in oil and gas production to be unlawful, TEX. NAT. RES.CODE §§ 85.045, 86.011, and has com-

manded the Railroad Commission to prevent waste, *id.* § 86.082. "Waste" includes "physical waste or loss incident to or resulting from drilling, equipping, locating, spacing, or operating a well or wells in a manner that reduces or tends to reduce the total ultimate recovery of oil or gas from any pool." *Id.* § 85.046(6); *see also id.* § 86.012(5).

39. *Hastings Oil Co. v. Tex. Co.*, 149 Tex. 416, 234 S.W.2d 389, 396 (1950).

40. *Manziel*, 361 S.W.2d at 568.

Commission designates as tight sands areas, formations where fracing is the sole method capable of producing in commercial quantities.[41] Fracture stimulation is the "universal well completion technique in tight gas sands," [42] and Texas law aims to facilitate economic production from areas with poor native porosity and permeability, like in South Texas. Coastal's expert testified that Hidalgo County, where this case arose, produces more than double the gas it produced a quarter-century ago, and the reason is undisputed: sophisticated fracing techniques. As of May 2008, the Railroad Commission had approved roughly 1,300 tight gas formations in the State,[43] and the Commission understands fully that "to be able to produce gas at volumes that are economical, reservoirs with low permeability must be treated." [44]

Given the omnipresence of fracing in modern industry practice, as recognized by Texas law, the Railroad Commission, and the Land Commission, it is unwise to expose operators to punitive sanctions and broader society to the manifold costs of reduced energy supply.

### B. Fracing Is Not Merely Non–Actionable Trespass, But No Trespass at All

I agree with the Court as far as it goes. If the choice is (1) extend trespass liability to thwart a proven and widespread recovery technique or (2) extend the rule of capture—perhaps "the most important single doctrine of oil and gas law" [45]—I favor the latter.[46] To recognize a rule of capture yet at the same time prohibit fracing would create an asymmetry in Texas oil and gas law that leaves the rule of capture frozen in time (at the worst possible time), unable to adapt to essential new technologies.

My departure from the Court's reasoning is a narrow one. The Court says "no

---

41. *See* Tex. Tax Code § 201.057; 16 Tex. Admin. Code § 3.101.

42. Burney & Hyne, *supra* note 34, at 19–17.

43. Railroad Commission of Texas, Oil & Gas–Statewide Rule 101–Approved Tight Gas Formation–Index Listing, http://www.rrc.state.tx.us/divisions/og/publications/hgindex.html (last visited Aug. 27, 2008).

44. Water Use, *supra* note 28.

45. 1 Ernest E. Smith & Jacqueline Lang Weaver, Texas Law of Oil & Gas § 1.1(A) (2d ed.2006). We have recognized for almost a century that drainage of oil or gas from beneath another's land is perfectly legal if the wellbore itself does not cross lease boundaries and the operator complies with Railroad Commission requirements. *See Bender v. Brooks*, 103 Tex. 329, 127 S.W. 168, 170 (1910); Smith & Weaver, *supra* § 1.1(E). Plaintiffs do not allege that Coastal's wellbore encroached into its property, and it is undisputed that Coastal complied with all pertinent Railroad Commission regulations.

46. The rule of capture has variously been explained as (1) a practical acknowledgment of the difficulties in determining the source of a well's production, (2) justified due to the availability of self-help, and (3) "a practical accommodation of the infant oil industry." Smith & Weaver, *supra* note 45, § 1.1(A). As to the last justification, "[a]n accounting for oil drained from other tracts would have placed the entire risk of a dry hole or unproductive well upon the driller while allowing neighboring landowners to benefit from a successful venture." *Id.* While the Texas energy industry is no longer in its infancy—indeed, it is quite mature (hence the imperative need for advanced recovery technologies)—these same concerns, including the free-rider problem, persist and are equally applicable to fracturing. The liability decision should not turn on whether proppant and frac fluid migrate across an imaginary vertical plane separating two properties miles underground (particularly when the fact of such migration is often unknowable). *See* Burney & Hyne, *supra* note 34, at 19–3 ("The extent of the fractures out from the wellbore can be determined only by *theoretical* calculations." (emphasis added)).

liability" because, while it presumes a trespass occurred, the rule of capture precludes injury: no injury, no lawsuit. I would instead tackle a more threshold issue, one we addressed in *Manziel* almost a half-century ago: whether formalistic trespass principles apply with equal force to the recovery of ever-dwindling supplies of natural resources miles below the surface.

To many people, a subsurface intrusion of fissures, fluid, and proppant invites a simple application of rudimentary trespass principles. Why not call a tort a tort? Well, *we* affix that common-law label, and not every technical intrusion, no matter how small, warrants damages, no matter how large. Trespass is a court-defined doctrine, and it falls squarely on this Court's shoulders to decide what is actionable. In doing so, we made clear in *Manziel* the common law must permit common-sense accommodations for technological breakthroughs that benefit society.

In *Manziel*, our watershed waterflood case, we flatly rejected an absolutist trespass standard, stressing that the definition of trespass must make room for industry innovations.[47] We unanimously rejected a theory of trespass based on an earlier-developed secondary recovery practice (waterflooding) that was used to develop the giant East Texas field.[48] In a water-

flood, usually conducted after primary production methods have ceased, water is injected under pressure into a reservoir to push residual oil toward certain output wells. The plaintiffs in *Manziel* complained the waterflood amounted to "trespass by injected water" that would drain oil from beneath their lease by pushing it to other properties and "result in the premature destruction of their producing ... well."[49] We held that injected water that crosses lease lines did not constitute trespass: "The orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources."[50] Basically, we held the law of trespass must not be applied in an unduly dogmatic manner to the oil and gas industry,[51] a statement I believe counsels against the *existence* of liability, not merely the *extent* of liability.[52]

Notably, we did not concede in *Manziel* that waterflood amounted to trespass but opt against liability because the good outweighed the bad. Indeed, if encroachment from waterflooding were deemed trespassory, then public policy considerations could not even be factored in.[53] Nor did we say the rule of capture precluded the plaintiffs whose oil was swept away from claiming a compensable injury. Rather,

---

**47.** *R.R. Comm'n of Tex. v. Manziel,* 361 S.W.2d 560, 566–70 (Tex.1962).

**48.** *Id.* at 568–69 & n. 5.

**49.** *Id.* at 565.

**50.** *Id.* at 568.

**51.** *Id.*

**52.** As for the plaintiffs' contention that the rule of capture ceases to apply when a producer uses an "unnatural" recovery technique, I too, like the Court, am unpersuaded. Plaintiffs nowhere define "natural" production, but granting protection under the rule of capture only if the minerals flow totally un-

aided is assuredly un-natural and would deny protection to scores of everyday recovery techniques above and beyond fracturing— techniques that the Railroad Commission has long permitted. Indeed, all modern production technologies are artificial to some degree; oil and gas do not ordinarily seep out of the ground by themselves or when Jed Clampett's errant bullet sends up a geyser of "bubbling crude." This natural/artificial dichotomy has no support in Texas law and is rather hard to take seriously; the common law must be informed by common sense.

**53.** *Manziel,* 361 S.W.2d at 568–69.

this Court, employing a balancing-of-interests analysis more common to nuisance cases, unanimously declared that injecting water beneath your neighbor's land was simply not a trespass because it was not wrongful:

> Certainly, it is relevant to consider and weigh the interests of society and the oil and gas industry as a whole against the interests of the individual operator who is damaged; and if the authorized activities in an adjoining secondary recovery unit are found to be based on some substantial, justifying occasion, then this court should sustain their validity.[54]

No intervening event, legal or technological, in the forty-six years since *Manziel* urges a different result today than in that case, which incidentally involved a far greater physical invasion (waterflood) that, according to some, inflicts far greater (and irreversible) damage than fractures extending from a wellbore.[55] Plus, with waterflooding, migration across lease lines is guaranteed; with fracing, it's not, since fracture length and direction cannot be precisely controlled. Fracing (like waterflooding) involves the injection of fluids across lease lines, but fracing (like waterflooding) is not a trespass because fracing (like waterflooding) is not wrongful because fracing (like waterflooding) generates societal and economic benefits that outweigh any harm to individual operators. Allowing wide-open trespass damages would unleash a judicial waterflood, as it were, driving out a large amount of oil and gas production, and driving up the cost of any frac-based production that remained.

### C. Landowners Already Have Non–Trespass Remedies in Non–Drainage Cases

The Court reserves judgment on whether fracing might constitute trespass in non-drainage cases—for example, if Coastal's frac job had damaged the Share 13 plaintiff's wells or the Vicksburg T formation beneath their property. The plaintiffs claim no such injuries, but I would foreclose the possibility of trespass-based damages in non-drainage cases for a simple reason: settled Texas law already affords ample relief in such cases. Our precedent dating back 60 years makes clear that, notwithstanding the rule of capture, adjacent property owners may sue a driller who, through fracturing or otherwise, negligently damages a common reservoir, thus reducing recoveries and causing waste.[56] Other settled precedent makes clear that Texas law affords no rule-of-capture immunity for waste or destruction stemming from a negligent well blowout.[57]

### II. A Comment on the Dissent

### A. Fracing Is Not Slant–Hole Drilling by Another Name

The dissent likens fracing to slant-hole drilling, intentionally bottoming a drill bit

---

**54.** *Id.*

**55.** Broomes, *supra* note 15, at 20–23 to 20–24 ("By contrast [to fracing], a waterflood inflicts catastrophic damage to mineral owners who are not included in the secondary recovery unit ... A waterflood could fairly be described as the atomic bomb of subsurface trespasses because its effects are the complete, irreversible destruction of the potential to produce oil and gas from the flooded zones on any land onto which the water encroaches.").

**56.** *See Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 562–63 (1948) (recognizing negligence liability for harming the common reservoir); *see also HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 886–88 (Tex.1998).

**57.** *See Comanche Duke Oil Co. v. Tex. Pac. Coal & Oil Co.,* 298 S.W. 554 (Tex. Comm'n App.1927, judgm't adopted) (jury finding that using 600 quarts of nitroglycerin to boost production ruined a nearby offset well).

beneath the vertical boundaries of another's land. I see multiple and meaningful distinctions between fraced wells and deviated wells, as does the Railroad Commission.

First, a slant-hole driller exerts absolute control, knowing and directing with GPS-like precision *exactly* where the drillbit is and where it's going. Fracing, as plaintiffs' expert conceded, is highly unpredictable; under present-day petroleum engineering technology, a fracture's direction cannot be determined or controlled, except by Mother Nature, and a fracture's length cannot be precisely measured.[58] Second, a slant-hole well, encased in connecting pipe, remains open at its bottom-hole location, while only a portion of the initial fracture actually contributes to capturing minerals.[59] Third, nobody contends that bottoming a wellbore beneath your neighbor's property is indispensable to Texas oil and gas production; everybody-including plaintiffs' own expert-agrees that fracing is absolutely critical in low-permeability areas like South Texas.[60] Fourth, the Railroad Commission has never treated slant-hole drilling and frac drilling the same. In exercising its expertise, the Commission sees sharp distinctions between slant-hole wells and fraced wells, regulating the former heavily and the latter hardly at all: "the Commission has never categorized wells that have been fracture stimulated as 'deviated' wells by requiring a permit for the fracture job or attempting to determine the location of the fractures to assess compliance with spacing rules of other Commission rules."[61] The Commission has always focused on the location of the wellbore itself, not any fractures or other subsurface features that might impact drainage.

## B. We Should Defer to the Railroad Commission's Discretion, Not Usurp It

Oil and gas drilling is painstakingly regulated by the Railroad Commission, which possesses sweeping jurisdiction over all Texas oil and gas wells and all persons engaged in drilling or operating such wells.[62] The Legislature has conferred open-ended authority to "adopt all necessary rules for governing and regulating persons and their operations" within the Commission's jurisdiction.[63] This jurisdiction includes "the use of techniques to enhance production and protect correlative

---

**58.** *See* Ragsdale, *supra* note 15, at 338 n. 128.

**59.** Plaintiffs' expert testified that hydraulic fracturing produces four lengths: (1) fracture length, (2) hydraulic length, (3) propped length, and (4) effective length, stating "I not only agree [that those lengths exist], I'm the author of those definitions." No one disputes that only the effective length enhances mineral recovery.

**60.** As plaintiffs' expert testified, in such areas it is indispensable to viable production: "without hydraulic fracturing, there is no hope for economically attractive production in any ... of the formations that I know of [in South Texas]." We have recognized that lessees have a duty to use successful modern production methods. *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 & n. 1 (Tex.

1981). Hydraulic fracturing is a paradigm example of such a method. If the dissent's view controlled, an operator, particularly one operating on a smaller tract, would face a dilemma of fracing a well and thus risking a high-stakes trespass lawsuit from nearby landowners, or declining to frac and thus risking a high-stakes "failure to develop" lawsuit from its lessor.

**61.** Commission rules governing the approval and operation of slant-hole wells are comprehensive to say the least, *see* 16 Tex. Admin. Code § 3.11, but the Commission has never required special permitting to frac a well.

**62.** Tex. Nat. Res. Code § 81.051.

**63.** *Id.* § 81.052.

rights."[64] More specifically, the Commission has the authority to make rules and issue orders that "require wells to be drilled and operated in a manner that will protect injury to adjoining property."[65]

In exercising that jurisdiction, the Railroad Commission has promulgated extensive regulations regarding oil and gas drilling generally but none that single out fracing specifically.[66] If, in the course of advancing its legislative mandate to prevent waste and safeguard correlative rights, the Commission deems fracturing a practice potentially unfair to nearby landowners, it has wide discretion to weigh the competing interests and strike the proper regulatory balance. The Commission could, after listening to all interested parties, modify Statewide Rule 37 regulating the minimum distance a well can be located from a property line.[67] But whether that distance should be stretched to 500 feet, 1,000 feet, or 1,500 feet is utterly beyond this Court's expertise. The Commission could, as Georgia regulators do, require notice before commencing a frac job.[68] Indeed, the Commission could impose any number of targeted spacing, density, pooling, production, or other rules on fraced wells in order to achieve the legislative objectives of preventing waste, calibrating correlative rights and preventing undue injury to adjoining land.[69] It could do administratively what other states (notably not Texas) have done legislatively and require operators to obtain a permit[70] before fracing a well. But it has not done so, and this restraint, far from showing the absence of public policy, demonstrates the Commission pursues its legislative charge in a manner that facilitates technological innovation.

The Share 13 Plaintiffs argue "Coastal and the *amici* can always seek legislation or [Railroad Commission] rules to properly address their concerns." That puts the shoe on the wrong foot. Hydraulic fracturing occurs daily throughout Texas, encouraged by state tax law aimed at boosting production from tight, hydrocarbon-bearing formations, and is a technique championed by the agency vested with broad powers to regulate it. Why must Coastal seek legislative or administrative action to thwart a cause of action this Court has never formally recognized when the agency that oversees oil and gas production has issued no rules or orders that

---

**64.** *Amarillo Oil Co. v. Energy–Agri Prods., Inc.*, 794 S.W.2d 20, 26 (Tex.1990).

**65.** Tex. Nat. Res.Code § 85.202(a)(4); *see also Texaco, Inc. v. R.R. Comm'n*, 583 S.W.2d 307, 310 (Tex.1979) ("It is now well settled that the Railroad Commission is vested with power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights.").

**66.** *See, e.g.*, 16 Tex. Admin. Code § 3.24 (requiring check valves where more than one well is connected to a common line, separator, or manifold); § 3.37 (*statewide spacing rule*); § 3.38 (well densities). The Commission does require notification, as part of forms W–2 and G–1, when fracing will be used on a well, but it does not require permission. *See* §§ 3.16, 3.51, 3.80(a).

**67.** 16 Tex. Admin. Code § 3.37 (providing that no well shall be drilled closer than 467 feet to any property or lease line).

**68.** Ga. Comp. R. & Regs. §§ 391–3–13–.11, 391–3–13–.12(2).

**69.** *See* Tex. Nat. Res.Code § 86.081(a)(2) (authorizing Commission to regulate gas production to "adjust the correlative rights and opportunities of each owner of gas in a common reservoir"); § 85.202(a)(4) (directing Commission to promulgate rules and orders that "require wells to be drilled and operated in a manner that will prevent injury to adjoining property").

**70.** Va Code Ann. § 45.1–361.11; W. Va.Code Ann. § 22–6–12.

tie Coastal's hands? The Commission's considerable policymaking expertise strongly militates against recognizing a new form of open-ended tort liability.[71]

I would defer to the Railroad Commission, whose competence in this matter far surpasses our own, to balance the competing interests and fine-tune the production of Texas hydrocarbons. If the Commission believes free-market practices have become too clamorous, it can flex its regulatory muscle over the offending production activities. But whether drainage results from honest mistake or dishonest misdeed, the Commission is best positioned to strike the smartest balance to protect landowners' rights and safeguard the viability of fracing amid shrinking reserves. We should leave the regulation of Texas' energy sector to the regulators as the Legislature intended.

## C. Aggrieved Lessors Have Existing Remedies Short of Seeking Millions in Trespass Damages

The Share 13 Plaintiffs are not without alternative remedies. In this case, they pursued claims against their lessee, Coastal, for failure to protect against drainage and other claims. The clearest remedy is not a new-fangled tort action alleging trespass, but an old-fangled contract action alleging breach of the implied covenant to protect against uncompensated drainage, which the plaintiffs brought here.[72] Even when a mineral estate is under lease, the lessor's threat of litigation or actual litigation can spur a lessee to drill offset wells or engage in voluntary pooling, as apparently occurred in this case. The Share 13 Plaintiffs contend in their brief that "[i]t was only after suit was filed that Coastal acted to protect Share 13 from drainage."

Aside from litigation, a plaintiff can drill an offset well if he believes a fraced well on nearby property is causing drainage; self-help is the settled remedy under Texas law. As one venerable Texas oil and gas authority opined: "There is no reason for giving an injured party a cause of action for the violation of some legal right resulting from a reasonable use of adjacent land if the aggrieved party's remedy of self-help is completely adequate for his proper protection."[73] Our law has long recognized that if a landowner desires the hydrocarbon riches beneath his property, he should drill a well. This common-sense approach, also emphasized in the Railroad Commission's amicus brief, is especially warranted when the landowner sees that his neighbor has drilled a successful well next door. The landowner should drill his

---

**71.** In 2005, one current commissioner (who was then chair) reported to the United States Congress that "[h]ydraulic fracturing is a decade's old process for completing over 90% of the oil and natural gas wells drilled in the United States," and that "the states have been responsible for regulating this process." *Energy Policy Act of 2005: Hearing Before the Subcomm. on Energy and Air Quality of the H. Comm. on Energy and Commerce*, 109th Cong. 111 (2005) (statement of Victor Carrillo, Chairman, Railroad Commission of Texas), *available at* http://www.rrc.state.tx.us/commissioners/carrillo/press/energytestimony.html. Another current commissioner (also a former chair) wrote this a few months ago: "Innovative technology is bringing on line oil and gas production from heretofore noncom-

mercial and unconventional geological reservoirs ... Important new gas fields have been developed in areas that geologists once considered goat pasture." Jones, *supra* note 29, at A17.

**72.** *See Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567–68 (Tex.1981) (recognizing such liability where, as here, the lessee was the party doing the draining by producing from an adjacent tract).

**73.** A.W. Walker, Jr., *Property Rights in Oil and Gas and Their Effect Upon Police Regulation of Production*, 16 Tex. L.Rev. 370, 374 (1938).

own, not sue his neighbor for trespass; the rule of capture recognizes this simple concept, and I would preserve it. Self-help remedies are not always cheap or convenient (although a cheap fix in this case would have been a demand from Plaintiffs that Coastal drill some offset wells on Share 13) but their availability is another reason not to announce a new common-law tort. "The landowner is privileged to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate all the oil and gas that he may produce, so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission." [74] Should the law be different when the neighbor uses an advanced recovery technique, without which drilling would be impractical? [75] The dissent thinks so, but in my view fails to reason so.

### D. Allowing Tres–Frac Damages Would Portend Many Inconvenient Truths

Permitting trespass liability would be a grave blunder, auguring industry-wide tumult, the resulting tremors of which would be substantial and far-reaching. Both worldwide and in our energy-intensive State, energy is at once increasingly desired and increasingly scarce, and thus increasingly expensive. Courts shape the common law, but we cannot repeal the law of supply and demand any more than we can repeal the law of gravity. We occupy a petroleum-addicted world, and decades may pass before scalable fossil-fuel alternatives (wind, nuclear, solar, etc.) comprise a significantly larger piece of our diversified energy portfolio. Until then, letting neighbors file tresfrac suits against each other will only yield these stubborn realities: fewer wells will be drilled; fewer older (but still productive) wells will undergo remedial fracing to enhance recovery and will instead be plugged prematurely; huge swaths of Texas land will remain undeveloped, their resources utterly wasted.[76] The Texas economy would not grind to a halt, but it would feel the dampening effects of such a decision, and those effects would be real and acute.

Sixteen years ago in *Geo Viking, Inc. v. Tex–Lee Operating Co.*, we opened the door to trespass-by-fracture claims: "Fracing under the surface of another's land constitutes a subsurface trespass." [77] This attention-grabbing pronouncement had a short shelf life. We withdrew the opinion six months later, noting *Geo Viking* had been improvidently granted and expressly disavowing that anything we said should be "understood as approving or disapproving the opinions of the court of appeals analyzing the rule of capture or

---

**74.** *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 562 (1948).

**75.** In the pending case, expert testimony confirmed that drilling in this region would not be economically viable without fracturing. Certain "tight formations" produce gas in commercial quantities only through fracturing, and all the wells in the Vicksburg T field, including all of the wells drilled on Share 13, received fracture treatments. Coastal's expert testified that every well in South Texas has been subjected to at least one fracture treatment. The Share 13 Plaintiffs' expert testified that without fracturing "there is no

hope for economically attractive production" in the Vicksburg T.

**76.** As the Texas Energy Planning Council reported in its 2005 Texas Energy Plan: "Extending the useful and productive life of marginal wells encourages the domestic production of oil and gas. Once these wells are abandoned and plugged, Texas will lose access to this valuable natural resource." Texas Energy Planning Council, *supra* note 15, at 15.

**77.** 817 S.W.2d at 359, *on reh'g,* 839 S.W.2d 797 (Tex.1992).

trespass as they apply to hydraulic fracturing." [78] Fortunately, we avoid a similar mistake today.

\* \* \* \* \* \*

Given Texas' unrivaled leadership in shaping the nation's dynamic energy sector, "[o]ther states frequently look to Texas decisions when confronted with a new or unsettled issue of oil and gas law." [79] While I would tackle the trespass issue slightly differently, the reasoning underlying the Court's no-liability outcome provides a valuable legal roadmap. I agree that Texas law should not equate hydraulic fracturing across a lease boundary with actionable subsurface trespass. I also agree with the Court on all the various nontrespass issues.

Justice JOHNSON, joined by Chief Justice JEFFERSON, and by Justice MEDINA as to Part I, concurring in part and dissenting in part.

I join the Court's opinion except for Part II–B. As to Part II–B, I would not address whether the rule of capture precludes damages when oil and gas is produced through hydraulic fractures that extend across lease lines until it is determined whether hydraulically fracturing across lease lines is a trespass. As to Part IV–A, I agree that admission of the 1977 memo-

randum constituted error and was harmful, but I would hold that a harm analysis is not necessary because admission of the memorandum was incurable error.

## I. Rule of Capture

The rule of capture precludes liability for capturing oil or gas drained from a neighboring property "whenever such flow occurs solely through the operation of natural agencies in a normal manner, as distinguished from artificial means applied to stimulate such a flow." *Peterson v. Grayce Oil Co.*, 37 S.W.2d 367, 370–71 (Tex.Civ.App.–Fort Worth 1931), *aff'd*, 128 Tex. 550, 98 S.W.2d 781 (1936). The rationale for the rule of capture is the "fugitive nature" of hydrocarbons. *Halbouty v. R.R. Comm'n*, 163 Tex. 417, 357 S.W.2d 364 (1962). They flow to places of lesser pressure and do not respect property lines. The gas at issue here, however, did not migrate to Coastal's well because of naturally occurring pressure changes in the reservoir. If it had, then I probably would agree that the rule of capture insulates Coastal from liability. But the jury found that Coastal trespassed [1] by means of the hydraulic fracturing process, and Coastal does not contest that finding here.[2] Rather, Coastal contends that a subsurface trespass by hydraulic fracturing is not ac-

---

**78.** 839 S.W.2d at 797.

**79.** Ernest E. Smith, *Implications of a Fiduciary Standard of Conduct for the Holder of the Executive Right*, 64 TEX. L.REV. 371, 375 n.13 (1985).

**1.** *See* Laura H. Burney & Norman J. Hyne, *Hydraulic Fracturing: Stimulating Your Well or Trespassing?*, 44 ROCKY MTN. MIN. L. INST. 19–1, 19–45 (1998) ("Under both common law and modern definitions, a trespass occurs if a 'thing' physically crosses property boundaries.... [T]his definition is satisfied when fracing extends beyond lease or unit lines.").

**2.** As the Court notes, Coastal drilled the Coastal Fee No. 1 approximately 467 feet from the lease lines to the north and east. That made the well less than 700 feet from the lease lines north of the well through those east of it. Coastal knew it was going to hydraulically fracture the well because all the wells producing from the Vicksburg T were fracture-treated. The fracture operation on the well was designed to cause fractures to extend over 1000 feet from the well and force proppant into them to keep them open. There was disagreement as to whether the effective length of the fractures extended into Share 13. The jury resolved that in favor of Salinas.

tionable. In the face of this record and an uncontested finding that Coastal trespassed on Share 13 by the manner in which it conducted operations on Share 12, I do not agree that the rule of capture applies. Coastal did not legally recover the gas it drained from Share 13 unless Coastal's hydraulic fracture into Share 13 was not illegal. Until the issue of trespass is addressed, Coastal's fracture into Share 13 must be considered an illegal trespass. I would not apply the rule to a situation such as this in which a party effectively enters another's lease without consent, drains minerals by means of an artificially created channel or device, and then "captures" the minerals on the trespasser's lease. *See id.* at 375 (limiting the rule of capture to oil and gas that is legally recovered); *see also SWEPI, L.P. v. Camden Res., Inc.,* 139 S.W.3d 332, 341 (Tex.App.–San Antonio 2004, pet. denied).

In considering the effects of the rule of capture, the underlying premise is that a landowner owns the minerals, including oil and gas, underneath his property. *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 561 (1948). In *Halbouty,* this Court succinctly harmonized this property rule with the rule of capture:

> To infer that the rule of capture gives to the landowner the legally protected right to capture the oil and gas underlying his neighbor's tract is entirely inconsistent with the ownership theory. To harmonize both rules, the rule of capture can mean little more than that due to their fugitive nature, the hydrocarbons when captured belong to the owner of the well to which they flowed, irrespective of where they may have been in place originally, without liability to his neighbor for drainage. That is to say that since the gas in a continuous reservoir will flow to a point of low pressure the landowner is not restricted to the particular gas that may underlie his

> property originally but *is the owner of all that which he may legally recover.*

357 S.W.2d at 375 (emphasis added). Coastal concedes that gas must be legally produced in order to come within the rule of capture. *See also Elliff,* 210 S.W.2d at 562–63 ("[E]ach owner of land in a common source of supply of oil and gas has legal privileges as against other owners of land therein to take oil or gas therefrom by *lawful* operations conducted on his own land.") (emphasis added) (citing 1 W.L. SUMMERS, OIL AND GAS § 63 (Perm. ed.)); *Comanche Duke Oil Co. v. Tex. Pac. Coal & Oil Co.,* 298 S.W. 554, 559 (Tex.1929) ("[O]ne owner could not properly erect his structures, surface or underground, in whole or part beyond the dividing line, and thereby take oil on or in the adjoining tract, or induce that oil to come onto or into his tract, so as to become liable to capture there or prevent the owner of the adjoining tract from enjoying the benefit of such oil as might be in his land or as might come there except for these structures."). The key word is "legally." Without it, the rule of capture becomes only a license to obtain minerals in any manner, including unauthorized deviated wells, and vacuum pumps and whatever other method oilfield operators can devise.

Today the Court says that because Salinas does not claim the Coastal Fee No. 1 well violates a statute or regulation, the gas that traveled through the artificially created and propped-open fractures from Share 13 to the well "simply does not belong to him." But that conclusion does not square with the underlying rationale for the rule of capture as we expressed it in *Halbouty,* and as seems only logical and just: an operator such as Coastal owns the oil and gas that is *legally* captured. *See Halbouty,* 357 S.W.2d at 375. And "legally" should not sanction all methods other than those specifically prohibited by stat-

ute or rule of the Railroad Commission. It simply cannot be a legal activity for one person to trespass on another's property. *See* BLACK'S LAW DICTIONARY 522 (7th ed.1999) (defining "legal duty" as a "duty arising by contract or by operation of law; an obligation the breach of which would be a legal wrong [such as] the legal duty of parents to support their children"); *Texas–Louisiana Power Co. v. Webster*, 127 Tex. 126, 91 S.W.2d 302, 306 (1936) (noting that a trespasser is one who enters upon the property of another without any right, lawful authority, or express or implied invitation). The question the Court does not answer, but which it logically must to decide this case, is whether it was legal for Coastal to hydraulically fracture into Share 13. The answer to the question requires us to address Coastal's primary issue: does hydraulic fracturing across lease lines constitute subsurface trespass.

We have held that a trespass occurs when a well begun on property where the operator has a right to drill is, without permission, deviated so the well crosses into another's lease. *See Hastings Oil Co. v. Tex. Co.*, 149 Tex. 416, 234 S.W.2d 389 (1950). Coastal argues that there are differences between taking minerals from another's lease through fracturing and taking them by means of a deviated well. Maybe there are, even though both involve a lease operator's intentional actions which result in inserting foreign materials without permission into a second lease, draining minerals by means of the foreign materials, and "capturing" the minerals on the first lease. The question certainly is not foreclosed. *See Gregg v. Delhi–Taylor Oil Corp.*, 162 Tex. 26, 344 S.W.2d 411, 414 (1961); Terry D. Ragsdale, *Hydraulic Fracturing: The Stealthy Subsurface Trespass*, 28 TULSA L.J. 311, 339 (1993) (noting that "[f]rom both a functional and physical perspective, a hydraulic fracture is largely analogous to a directionally drilled well"). In *Gregg*, 344 S.W.2d at 414–15, we suggested that sand fracturing may constitute a trespass, and in *Railroad Commission of Texas v. Manziel*, 361 S.W.2d 560, 567 (Tex.1962), we implied that subsurface trespasses are not different from other trespasses.

To differentiate between a deviated well and a fractured well, the Court says that gas extracted from a neighboring lease through a deviated well is not subject to the rule of capture for two reasons: the neighbor cannot protect from such drainage by drilling a well, and there is no uncertainty that the deviated well is producing another owner's gas. I fail to follow the Court's logic. As to the first reason, the neighbor can protect from either a fracture extending into the neighbor's property or a deviated well. Both simply provide the means for gas to flow to an area of lower pressure and from there to the drilling operator's property where it is captured. The only difference is the degree of drainage that can be prevented by offset wells, and a fracture's exposure to the reservoir may be greater than that of the deviated well and thus drain more gas. As to the second reason, the purpose of both a deviated well and a hydraulic fracture is for gas to flow through them to be gathered at a distant surface. Coastal fractured its well so gas would flow through the fractures to the wellbore, and no one contends that gas did not do so. The evidence showed that the effective length of a fracture can be fairly closely determined after the fracture operation. Coastal's expert testified that the effective length of the fractures (that length through which gas will flow) did not extend into Share 13, while Salinas's expert opined that it did. As in most trials, the jury was called upon to resolve the conflicts in testimony. It resolved them in favor of Salinas. In sum, the jury decided

that part of the gas produced from Coastal Fee No. 1 was a result of the channel created by Coastal's fracturing into Share 13. There was evidence to support the finding.

The Court gives four reasons "not to change the rule of capture" to allow a cause of action for drainage accomplished by hydraulic fracturing beyond lease lines. I disagree with some of the four reasons,[3] but my fundamental disagreement is not with the reasons the Court gives. My fundamental disagreement is with the Court's premise that its decision is *not a change* of the rule of capture. I believe the Court is changing the rule, and I would not do so.

The Court says that mineral owners and lessors aggrieved by drainage because of hydraulic fracturing have numerous alternative remedies such as self help, suits against their lessee, offers to pool, and forced pooling. That is true in many cases, as witnessed by the amici briefs. But not all property owners in Texas are knowledgeable enough or have the resources to benefit from those remedies. The rules of ownership and capture apply to them, also. Amici and the Court reference the importance of hydraulic fracturing to development of the Barnett shale field and other mineral interests in Texas. Who could quarrel with the facts? But those reports in many instances refer to mineral leasing and royalty payment benefits being received by small property owners, in many cases so small as to be single-family residence owners. Today's holding reduces incentives for operators to lease

from small property owners because they can drill and hydraulically fracture to "capture" minerals from unleased and unpooled properties that would otherwise not be captured. Today's holding effectively allows a lessee to change and expand the boundary lines of its lease by unilateral decision and action—fracturing its wells— as opposed to contracting for new lease lines, offering to pool or utilizing forced pooling, or paying compensatory royalties. Such a situation is exemplified by the facts facing this Court in *Gregg,* 162 Tex. 26, 344 S.W.2d 411. Gregg had a small lease surrounded by mineral interests owned by Delhi–Taylor. *Id.* at 412. Gregg planned to "expand" his lease by fracing a well and recovering minerals that he would not have been able to recover otherwise because of the tight gas formation. *Id.* The problem was that he was going to be recovering some of the minerals from Delhi–Taylor's part of the reservoir. *Id.* We did not have difficulty recognizing that Gregg's fracing into Delhi–Taylor's minerals, if it occurred, potentially was a trespass that the courts could enjoin. *Id.* at 416.

Additionally, not all property owners in Texas may benefit from the remedies the Court mentions. For example, the Court references the Mineral Interest Pooling Act, and says that if an owner's offer to pool is rejected, the owner may apply to the Railroad Commission for forced pooling. *See* TEX. NAT. RES.CODE §§ 102.001–.112. But it is not clear that royalty owners such as Salinas can do so. *See id.* § 102.012; *R.R. Comm'n of Tex. v. Cole-*

---

**3.** The Court also says that proving the value of oil and gas drained by hydraulic fracturing deep under the ground is difficult. But similarly, proving the value of damages from breach of the implied covenant to protect from drainage requires expert testimony about a hypothetical well that should have been drilled to protect the lease, and calcula-

tion of the hypothetical effects that hypothetically would have taken place deep underground. *See Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004). Difficulty in proving matters is not a new problem to trial lawyers. Besides, Coastal does not mount an evidentiary challenge to the jury findings.

**46**

*man,* 460 S.W.2d 404 (Tex.1970) (interpreting predecessor statute).

The Court, Coastal, and amici reference the importance of hydraulic fracturing to the development of mineral interests in Texas, and raise valid concerns about the effect on mineral production if hydraulic fracturing subjects the fracturing operator to exemplary damages.[4] Just as a clean slate is not presented as to whether the rule of capture applies here, we do not have a clean slate in regard to mineral recovery operations and related considerations. In *Manziel,* this Court considered the legitimacy of salt water injection recovery operations authorized by the Railroad Commission. 361 S.W.2d 560. The public policy pronouncements set out in *Manziel* are applicable to techniques, such as hydraulic fracturing, that allow for more efficient and fuller recovery of diminishing mineral resources:

> The orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources. If the intrusions of salt water are to be regarded as trespassory in character, then under common notions of surface invasions, the justifying public policy considerations behind secondary recovery operations could not be reached in considering the validity and reasonableness of such operations. See: Keeton and Jones: "Tort Liability and the Oil and Gas Industry II," 39

TEX. LAW REV. 253 at p. 268. *Certainly, it is relevant to consider and weigh the interests of society and the oil and gas industry as a whole against the interests of the individual operator who is damaged; and if the authorized activities in an adjoining secondary recovery unit are found to be based on some substantial, justifying occasion, then this court should sustain their validity.*

361 S.W.2d at 568 (emphasis added).

The Legislature has made it the policy of this state to encourage secondary recovery of minerals, *Manziel,* 361 S.W.2d at 570, and has declared that waste in the production of oil and gas is unlawful. TEX. NAT. RES. CODE §§ 85.045, 86.011. Waste includes "physical waste or loss incident to or resulting from drilling, equipping, locating, spacing, or operating a well or wells in a manner that reduces or tends to reduce the total ultimate recovery of oil or gas from any pool." *Id.* § 85.046(6). *See also id.* § 86.012(5).

Courts have long protected the interests of mineral lessors by imposing duties on lessees in regard to protection and development of leases. *Grubb v. McAfee,* 109 Tex. 527, 212 S.W. 464, 465 (1919). Technology and the leasing process have developed through the years, but the law continues to support the goals of mineral lessors and society. It does so, in part, by implying covenants in leases that enhance exploration for and recovery of minerals and protect lessors' goals in executing leases.[5] *Amoco Prod. Co. v. Alex-*

---

4. Amici uniformly predict dire consequences if hydraulic fracturing of wells is subject to trespass liability standards. No brief offers support for the position that fracturing will affect drilling anywhere but in close proximity to lease lines. The briefs do not offer actual numbers, statistics, or even "educated guesses" directed to how many wells or locations would be affected.

5. One commentator has categorized the major implied covenants as follows:
 (A) Implied covenants to develop the leases.
 (1) To drill an initial well.
 (2) To reasonably develop the lease after production has been acquired.
 (B) Implied covenants of protection.
 (1) To protect against drainage.
 (2) Not to depreciate the lessor's interest.

*ander,* 622 S.W.2d 563, 567 (Tex.1981). One such duty of lessees encompassed within the covenant to manage and administer the lease is a duty to use modern methods of production. *See id.* n. 1. Manifestly, this is an area in which policy decisions predominate and in which the Legislature and Railroad Commission have the resources and expertise to provide rules and adjust equities among the various interests. Nevertheless, the law is flexible enough to balance the interests of society as to energy availability, the inability of producers to recover certain minerals in an economically viable manner absent use of methods such as hydraulic fracturing and the rights of individual mineral owners. *See Gutierrez v. Collins,* 583 S.W.2d 312, 317 (Tex.1979) (noting that the genius of the common law lies in its ability to recognize when a rule needs to be modified to better serve the needs of society). Even if it were to be decided that hydraulic fracturing is subject to traditional trespass rules, equitable considerations are proper in determining the availability of damages for trespass related to the recovery of minerals, just as equitable considerations resulted in implied covenants protecting and promoting goals of mineral leases and lessors. *See Bender v. Brooks,* 103 Tex. 329, 127 S.W. 168, 170–71 (1910) ("The controversy arises over the method by which the rights of the parties shall be adjusted.... The law will determine the rights of the parties, but equity will adjust the account between them."); *Hunt v. HNG Oil Co.,* 791 S.W.2d 191, 193 (Tex.App.–Corpus Christi 1990, writ denied).

(C) Implied covenants relating to management and administration of the lease.
 (1) To produce and market.
 (2) To operate with reasonable care.
 (3) To use successful modern methods of production and development.

In balancing the interests involved here, it seems that even if hydraulic fracturing is subject to trespass law, precluding recovery of *exemplary* damages for a trespass through a hydraulic fracture could be deemed reasonable. For example, the testimony in this case reveals that although the fracture length of an operation can be estimated before the job is done, the effective length—the length of the fracture through which gas will flow—cannot. Because there are clearly difficulties and technological limitations in these expensive but necessary operations, the law should be flexible in considering them. Preclusion of exemplary damages would be one way to minimize discouraging the use of advances in technology and recovery techniques, yet leave in place protection for rights of individual mineral owners to their property. A possible consideration for precluding exemplary damages if hydraulic fracturing were subject to trespass law could be the defense that, in light of industry standards at the time, a reasonably prudent lessee could have believed the fracturing operation was necessary to economically recover the minerals from the lessee's estate.

Whatever the result, I would decide the trespass issue.

## II. The 1977 Memorandum

Turning to the 1977 memorandum, Coastal moved for its exclusion prior to trial in a separate trial brief as well as during trial, yet the trial court admitted it. The offensive sentence referencing "illiterate Mexicans," along with most of the rest of the memorandum, was read to the jury when Salinas's counsel examined Coastal's

 (4) To seek favorable administration action.
R. HEMINGWAY, THE LAW OF OIL AND GAS § 8.1 (1971).

corporate representative. The memorandum was discussed again when Salinas's counsel asked plaintiff Margarito Salinas how the language of the memorandum made him feel. He testified that he and his other family members felt infuriated and insulted when they saw it because it insulted his ancestors. The court then granted Salinas's counsel's request to publish the exhibit to the jury.

The memorandum came up again in closing argument. As set out in the Court's opinion, Coastal's counsel argued that it was an attempt to inflame the jury: "They figure that if they can get you angry enough, then you are going to throw sound judgment out the window and that your decisions will be based on sentiment and not on reason." Coastal's argument on the issue clearly was an attempt to defuse the problem created by the offensive evidence and testimony.

Texas Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Balancing the probative value of the evidence against the risk of unfair prejudice, like other evidentiary rulings, is left to the trial court's discretion. *See Tex. Dep't of Transp. v. Able,* 35 S.W.3d 608, 617 (Tex.2000). In this instance, the inflammatory nature of the language was apparent and had no relevance to any issue being tried.

Salinas focuses on the relevance of the document to land title issues. Salinas also claims that the document was not unfairly prejudicial to Coastal, the cases Coastal cites are irrelevant because they concern jury arguments, and it was Coastal, not Salinas, that made a plea for racial unity. I am not persuaded.

The attorneys who prepared and tried this case were probably in the best position to predict the memorandum's inflammatory effect on the jury. We have recognized that one method of measuring the prejudicial impact of evidence is to consider "the efforts made by counsel to emphasize the erroneous evidence." *Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 144 (Tex.2004). The extent and intensity of opposing counsel's attempts to exclude the evidence, and failing exclusion, to neutralize its effects, should also be considered. *Id.* Coastal's attorneys saw the potential effect of the offensive language and tried on multiple occasions to exclude it from evidence. Salinas's counsel, on the other hand, never offered the memorandum without the offensive language and made sure that the memorandum was woven into the fabric of the trial. Further, although Salinas's attorney did not mention the memorandum's offensive language in his argument, one of Coastal's two attorneys who gave closing argument devoted his entire argument to the memorandum in a clear attempt to diminish its effect. Coastal's attorney referenced "gringos," stated that he was offended by the term "illiterate Mexicans," and spoke in Spanish to the jury when arguing that the jury should not accept Salinas's invitation "to throw sound judgment out the window." Salinas's counsel then addressed the memo in rebuttal argument with a less-than-subtle ethnicity-based appeal to the all-Hispanic jury:

> Yeah, maybe at one time *we* were people of the land. But, you know, some of these people got educated. They learned how to read. They learned how to write. And the—you know, the thing about that memo is that it shows the attitude, the attitude on the part of the corporation. If you'll notice, the corporation did not bring in one person that

received the memo, did not bring in the author of the memo to tell us what he really meant. No, they rely on some of these paid experts like Rick Garza who got paid 50,000 to prepare a map, or some of the lawyers that have nothing to do with this who are now coming in trying to explain something for this $10–billion corporation that didn't care enough to bring in the person that actually wrote the memo or received the memo so they can tell you what they really meant. *Why are they referring to a—1977 to illiterate Mexicans? Why not just call them owners of the land, owners of the royalty interest?*

(emphasis added).

Paraphrasing what we said in *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex.2005), the harm of this evidence is manifest. The memorandum was intended to and did inject racial prejudice into the trial. The question we are bound to address related to our system of justice is how to best minimize the number of cases that appear to be or are tried under the cloud of mistrust that admission of this type of evidence engenders. One commentator has addressed the problem as follows:

> It is important to recognize that rejection of race, religion and sex as classifications in rulings on relevance is not based entirely on the notion that there can be no logical distinctions resting on these bases; instead, it rests on the belief that in a multi-cultural society like ours, fairness in adjudication does not consist entirely in the accuracy of the factual determinations but may require some sacrifice of accuracy to avoid the suspicion that the decision rests on prejudice disguised as science.... Trial judges can expect much less leeway in appellate review of relevance rulings that involve such classifications.

CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE § 5179 (1978).

This Court has long recognized that it is not acceptable advocacy to attempt to inflame the jury with irrelevant evidence of or reference to such "hot-button" matters as sex, race, ethnicity, nationality, or religion. Texas courts have not hesitated to treat such irrelevant evidence and comments as incurable error. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 840 (Tex.1979) ("The injection of new and inflammatory matters into the case through argument has in exceptional cases been regarded as incurable by an instruction. An appeal to racial prejudice falls into the category."); *Tex. Employers' Ins. Ass'n v. Haywood*, 153 Tex. 242, 266 S.W.2d 856, 858 (1954) (holding that although inflammatory argument is usually regarded as "curable," racist argument "was so inflammatory and prejudicial that its harmfulness could not have been eliminated by either retraction or instruction"); *Tex. Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 863 (Tex.App.–San Antonio 1990, writ denied) ("[I]ncurable reversible error occurs whenever any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity."); *Penate v. Berry*, 348 S.W.2d 167, 168–69 (Tex.Civ. App.–El Paso 1961, writ ref'd n.r.e.) (finding that argument appealing to nationality prejudice was incurable error); *Tex. Employers' Ins. Ass'n v. Jones*, 361 S.W.2d 725, 727 (Tex.Civ.App.–Waco 1962, writ ref'd n.r.e.) (prejudicial argument referring to religion of witness was incurable error); *Basanez v. Union Bus Lines*, 132 S.W.2d 432, 432–33 (Tex.Civ.App.–San Antonio 1939, no writ) (stating that comments that plaintiffs were Mexicans and defendant

was "one of our citizens" were reversible error).

We recently held, in the context of jury argument, that some matters are not subject to harmless error analysis because they strike "at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts." *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 681 (Tex.2008). We held that such matters are "incurably harmful not only because of [their] harm to the litigants involved, but also because of [their] capacity to damage the judicial system." *Id.* We gave, as the paradigm example of such incurable error, "appeals to racial prejudice [that] adversely affect the fairness and equality of justice rendered by courts because they improperly induce consideration of a party's race to be used as a factor in the jury's decision." *Id.* I would apply the same analysis where appeal to racial prejudice is made though admission of documentary evidence. And, I would hold that pleas for ethnic solidarity or racial prejudice are unacceptable even when not made in explicit terms. *See Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 857 (2005).

In this case, the offensive language could have been redacted. While a redaction probably would have drawn jurors' attention to the redaction and might have caused confusion or misinterpretation, redactions or other methods of screening irrelevant and passion-inducing evidence are better than allowing admission of evidence that distorts the fact-finding process. The term "illiterate Mexicans" may have been one of historical fact rather than a racial slur. But even if the words were originally intended to be only historical fact, at the present time the phrase undoubtedly induces strong feelings along racial lines. And as to the argument that Coastal did not object timely to Margarito

Salinas's testimony about how the memorandum made him and his family feel, a major part of the damage would have been accomplished by the mere asking of the question and Coastal's making an objection. An objection would have highlighted the language as well as the fact that Coastal recognized its offensive nature.

Salinas has not claimed that the offensive phrase was relevant to an issue regarding race, such as discrimination, or that Coastal's damage causing actions were racially motivated. The trial court or Salinas's lawyers could have found some way to introduce the contents of the memorandum without introducing the racially oriented language if they truly felt the memorandum's contents were relevant for some purpose other than arousing racial prejudice. For example, they could have redacted the offensive language, or read the memorandum's contents into the record minus the offending language. Admitting the memorandum in its entirety made all its contents part of the trial. It was used to examine witnesses, was published to the jury, was available for counsel to reference during trial and jury argument, and was available for the jurors to review during their deliberations. I would hold that a harm analysis is unnecessary. Intentional introduction of evidence such as the memorandum with its offending phrase affects not only the particular case in which it is admitted, but also sets a precedent and strikes at the appearance of and actual impartiality, equality, and fairness of justice rendered in our judicial system. I would hold that admission of the memorandum requires reversal and remand for a new trial without conducting a harm analysis. *See Living Ctrs.*, 256 S.W.3d at 680–81.

I would not hold that the rule of capture applies to gas produced from Share 13 by means of the hydraulic fracture. I would

not render judgment for Coastal on the trespass claim based on the rule of capture and would consider Coastal's issue as to whether hydraulic fracturing can constitute a subsurface trespass. I agree that the 1977 memorandum requires the case to be reversed. Otherwise, I join the Court's opinion and agree that the case must be remanded for a new trial.